267 S.E.2d 100 (1980)
BOARD OF SUPERVISORS OF LOUDOUN COUNTY, et al.
v.
Theodore N. LERNER, et al.
Record No. 780673.
Supreme Court of Virginia.
June 6, 1980.
*101 Thomas V. Monahan, Winchester (Robert T. Mitchell, Jr., Hall, Monahan, Engle, Mahan & Mitchell, Winchester, on briefs), for appellants.
John T. Hazel, Jr., Fairfax (Francis A. McDermott, Thomas W. Nalls, Leesburg, Hazel, Beckhorn & Hanes, Fairfax, Nalls, Chamblin & Chapman, Leesburg, on brief), for appellees.
Before I'ANSON, C. J., and CARRICO, HARRISON, COCHRAN, POFF, COMPTON and THOMPSON, JJ.
CARRICO, Justice.
On November 1, 1974, Theodore N. Lerner and others, trading as Lerner-Route 7 Limited Partnership (hereinafter, Lerner) applied to the Board of Supervisors of Loudoun County (hereinafter, the Board), for the rezoning of 177 acres of land from PD-IP (Planned Development-Industrial Park) classification to PD-SC (Planned Development-Shopping Center) category. On December 16, 1975, the Board denied the application.
Thereafter, Lerner filed in the court below a motion for declaratory judgment alleging that the denial was unreasonable and a confiscation of property rights. The motion prayed for an adjudication that the denial was arbitrary, capricious, and unreasonable and therefore void. After a hearing, the court declared by final decree entered February 21, 1978, that the Board's action was "confiscatory, unreasonable, arbitrary and capricious" and therefore invalid. The court ordered the Board to reconsider Lerner's application and enjoined the Board from taking action which would disallow the use proposed by Lerner. The Board was awarded this appeal.
The record shows that the 177-acre tract in question is a part of a larger tract containing 420 acres located on the south side of Route 7 at its intersection with Route 28 in the eastern portion of Loudoun County, north of Dulles International Airport. Route 7 is a major traffic artery traversing the breadth of Loudoun County and joining the City of Alexandria on the east with the City of Winchester on the west. Route 28 is a heavily traveled highway running from Route 7 southward to the Dulles Airport access road and thence to Route 50, Interstate Route 66, and Routes 29-211.
At least since 1969, the 420-acre parcel has been zoned for industrial use. In May, 1969, the county planning department prepared a Comprehensive Development Plan for the county. In a section devoted to "Commercial Development," it was stated:
"At the present time, much of the economic demand generated by the residents of eastern Loudoun is being satisfied outside the county's boundaries. In order to meet the vigorous competition from out of county shopping centers, a large and attractive shopping facility must be developed within the country. The most logical location for this facility is in the vicinity of the intersection of Routes 7 and 28. This location provides good access with respect to major transportation corridors and the location of anticipated community growth."
A plat accompanying the proposed plan placed the location of a regional shopping center at the intersection of Routes 7 and 28 in proximity to the 420-acre tract in question.
Aware of this proposal, Howard R. Koven, a Chicago attorney, and several associates, began in the summer of 1969 to acquire the 420-acre tract in anticipation of its future development as a regional shopping center. On December 2, 1969, the Board formally adopted the Comprehensive Development Plan. Despite two revisions of the Plan by the Board since 1969, the proposal for a regional shopping center at the location originally indicated has not been changed.
*102 In 1972, the parcel was placed in its present Planned Development-Industrial Park classification. This classification permits, among other things, research, development, testing, manufacturing, processing, fabrication, assembly, and distribution activities.
In 1973, in reliance upon the Comprehensive Plan's proposal for a regional shopping center, Theodore N. Lerner purchased a one-half interest in the 420-acre tract and formed with the original purchasers the Lerner-Route 7 Limited Partnership. Mr. Lerner previously had developed several regional shopping facilities in the Washington area, including the Tysons Corner Center, located in Fairfax County approximately 14 miles from the land involved in the present case.
The Lerner organization prepared plans to develop the 177-acre portion of the 420-acre tract as a regional shopping facility to be known as the Windmill Center. Lerner proposed to develop the project in phases, planning to open a 600,000 square foot facility in 1980 and ultimately to expand the center by 1984 to approximately 1,000,000 square feet.
As indicated previously, in November, 1974, Lerner applied to the Board for rezoning of the 177-acre tract to permit its commercial development as a regional shopping center. The application was referred to the county planning staff for study and report.
The Comprehensive Plan established a number of standards "as guidelines for new commercial development." For a regional shopping center, the Plan provided a standard, among others, of a "minimum population to support" of 100,000 to 200,000 within a radius of 5 to 15 miles for a center containing 400,000 to 1,000,000 square feet.
In a report to the Planning Commission and the Board, the planning staff reported that Lerner's application met or exceeded "the minimums" set forth in the Comprehensive Plan, with the exception of the standard concerning the "minimum population to support" a regional shopping center. On this point, the staff reported that, while the minimum population did not currently exist, it was likely to be present by the time construction of the center was completed in the 1980's. The report continued with the observation that "[p]lanners agree that the population needed to support a regional shopping facility must be considered a variable, rather than a fixed measure." The report stated further that factors "such as income level, disposable income, dilution by competition and varying methods of merchandising and store size all enter the calculation" and are of "greater significance" than population "when measuring a `trade area' needed to support a regional facility." Finally, the staff noted that the 177-acre tract in question "obviously complies with [the] standard ... envisioned" by the Comprehensive Plan for the "siting of a regional facility" in the vicinity of Routes 7 and 28. Basing its action "primarily on the recommendations" of the Comprehensive Plan, the planning staff supported approval of Lerner's application.
The Planning Commission, by divided vote, also recommended approval of the application. The Board, however, after a series of public hearings, unanimously denied the application.
The denial by the Board of Lerner's rezoning application was legislative action. As such, it is presumed to be reasonable. While not conclusive, this presumption stands until it is overcome by evidence that the legislative action is unreasonable. And the burden of establishing unreasonableness is upon the one who attacks the legislative action. Board of Supervisors v. Carper, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959).
Legislative action is reasonable if the matter in issue is fairly debatable. County of Fairfax v. Parker, 186 Va. 675, 680, 44 S.E.2d 9, 12 (1947). An issue may be said to be fairly debatable when, measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions. Fairfax County v. Williams, 216 Va. 49, 58, 216 S.E.2d 33, 40 (1975).
*103 In Fairfax County v. Snell Corp., 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974), we established this test for determining whether the presumption of reasonableness of zoning action should prevail or has been overcome:
"Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance `must be sustained'. If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained."
Upon review of a trial court's finding that the denial of a rezoning request is unreasonable, we accord the court's finding, as with the usual case, a presumption of correctness, but we also give full credit to the presumption of validity of the legislative action involved in the denial and then, assimilating the two presumptions, we examine the record to determine whether the evidence sustains the court's finding. See Fairfax County v. Williams, 216 Va. at 52, 58, 216 S.E.2d at 36, 40. In other words, the presumption of validity of legislative action does not disappear when a trial court finds that the action is unreasonable; the presumption accompanies the legislative action when the latter is brought to this court for review, and it is viable until this court holds with the trial court that the legislative action is unreasonable.
Turning to the present case, we find that, in the court below, the parties focused their attention upon three primary issues, viz., (1) the "minimum population to support" standard of the Comprehensive Plan, (2) the availability of public services, and (3) the impact of the proposed center upon the economic welfare of Loudoun County. On these points, the trial court found (1) "that there is more than 100,000 population within the 5-15 mile radius of the center as required by the Comprehensive Plan"; (2) that "sewer facilities, water, fire control and other governmental services ... are available now or will be in the reasonably foreseeable future"; and (3) that the evidence concerning the adverse impact upon the economic welfare of the county was "speculative at best" and that the center would "benefit the county as a whole and not be a detriment."
In the view we take of the case, we find it unnecessary to consider issues (2) and (3) outlined above, or to pass upon the correctness of the trial court's findings with respect thereto. We believe the case turns upon issue (1) viz., the "minimum population to support" standard of the Comprehensive Plan. If, as the Board contends, Lerner failed to show at least substantial compliance with the standard, then this failure "alone constituted a valid basis for denial of the application by the Board."
As has been noted, the Comprehensive Plan establishes the standard for a regional shopping center of a "minimum population to support" of 100,000 to 200,000 within a radius of 5 to 15 miles. A 15-mile radius drawn around the Windmill site encompasses approximately the eastern half of Loudoun County, the western portion of adjoining Fairfax County, and a sizeable segment of Maryland, across the Potomac River. All connected with the case appear to agree that, because of the inaccessibility of the site to the Maryland segment, the Maryland population should be disregarded in determining whether the population standard of the Comprehensive Plan has been satisfied.
If, as Lerner contends, the population standard of the Comprehensive Plan is interpreted to mean only the mere presence within a 15-mile radius of a minimum of 100,000 residents, then Lerner has satisfied the standard. The evidence shows that the 1970 population within the Virginia portion of the 15-mile radius was 149,460 persons and that the Virginia population in 1975, the year Lerner's application was heard by the Board, was 175,000 persons.
The Board contends, however, that Lerner's "use of all [the Virginia] population within a 15 mile radius" is insufficient to satisfy the minimum standard of the Comprehensive Plan. The Board interprets the term "minimum population to support" to *104 mean only those persons residing within the 15-mile radius at the time a rezoning application is heard who, as determined, for example, by a market analysis of the area, will actually support the center and form its "shopping base." When the term is given this meaning, the Board asserts, then Lerner's "own figures established a population to support the center well below the requirements of the plan."
While the term "minimum population to support" may be subject to the two interpretations advanced by the parties, we believe that the Board, acting within its discretion, was entitled to interpret the term in the manner it thought would best implement the Comprehensive Plan, provided the interpretation was reasonable within the context of the language employed in the Plan. In this context, we find reasonable the interpretation placed upon the term by the Board. Indeed, it is the only interpretation that has any practical meaning, and it is the interpretation that Lerner itself, despite its in-court insistence that mere numbers would satisfy the minimum standard, employed to establish the need and viability of the proposed shopping center.
Criticizing the 15-mile radius approach as an inappropriate test "for a regional mall," Lerner conducted a "trade area study," which it considered "to be of vital importance" in determining whether "there was sufficient threshold population to support a facility at the subject location." In this study, Lerner's experts employed factors similar to those set out in the report of the county planning staff. In its analysis, Lerner allotted to the Windmill site only the population it believed would actually shop there; it eliminated as prospective Windmill customers those persons it believed would shop at competing centers in Fairfax County.
Lerner established a "market area" composed of a small portion of Fairfax County and all of Loudoun County, including a considerable part of the latter jurisdiction lying outside the 15-mile radius. Based upon this approach, Lerner estimated that in 1974, the year it applied for rezoning, "the population which would support the center" was 65,950. No figures were provided for 1975, the year in which the application was heard and denied. Lerner's projected population figure for 1976 was 81,780; for 1978, 92,850; and for 1980, 104,900. Therefore, it would not have been until 1980, or five years after the rezoning application had been denied, that the 100,000 "minimum population to support" the proposed center, even under Lerner's approach, would have been reached.
What Lerner, in its "trade area study," and the county planning staff, in its report, urged upon the Board was that it disregard the minimum population standard of the Comprehensive Plan and substitute therefor the views of Lerner's experts and of the staff that the proposed project was needed and viable, notwithstanding that the minimum population was not yet in place. But the Board was not bound to accept this substitution. While the minimum standards of the Comprehensive Plan may be only guidelines and not requirements to be applied inflexibly by the Board, it was still a matter within the Board's discretion to decide whether to adhere to those standards or to follow some other reasonable approach in determining whether to grant or to deny the rezoning application.
Adopting the Board's interpretation of the term "minimum population to support" as meaning population in place that will likely shop at a proposed center, and considering the record as a whole, we believe that Lerner failed in its burden of challenging the presumptive reasonableness of the Board's action by probative evidence of unreasonableness. Fairfax County v. Snell Corp., supra, 214 Va. at 659, 202 S.E.2d at 893. Lerner's own "population to support" figures fell so far below the minimum standard of the Comprehensive Plan as to render the proof of its allegations of unreasonableness and confiscation completely insufficient to overcome the presumption of validity of the zoning action, and the presumption stands to sustain that action.
We are of opinion, therefore, that the evidence does not support the trial *105 court's finding that Lerner satisfied the minimum standards of the Comprehensive Plan. Accordingly, we hold that it was error for the trial court to rule that the denial of Lerner's application was "confiscatory, unreasonable, arbitrary and capricious" and therefore invalid.
For the reasons assigned, the judgment of the trial court will be reversed, and Lerner's motion for declaratory judgment will be dismissed.
Reversed and dismissed.