## Richmond

BOARD OF SUPERVISORS
OF FAIRFAX COUNTY

V.

DAVID L. PYLES

January 21, 1983.

Record No. 801038.

Present: All the Justices.

*J. Patrick Taves, Assistant County Attorney (David T. Stitt, County Attorney; George A. Symanski, Jr., Assistant County Attorney,* on briefs), for appellant.

*H. Kendrick Sanders (Gilliam, Sanders & Brown,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this land use controversy, we review the trial court's finding that the local legislative body acted in an arbitrary, capricious, and unreasonable manner in denying a rezoning application.

In October of 1978, appellee David L. Pyles asked appellant Board of Supervisors of Fairfax County to change the zoning classification of 4.4 acres of land lying on Little River Turnpike (State Route 236) near Braddock Road in the Annandale area. Pyles, owner and operator of Dave Pyles Lincoln-Mercury automobile dealership, plans to expand his business premises from the present five-acre tract (designated parcel "A" on the below sketch of the area) onto the adjacent parcel (designated "B" and delineated by heavy lines), the subject of this dispute.

Pyles applied to change the existing zoning classification from R-2 (residential, two dwelling units per acre) to C-6 (community retail commercial) on the western 2.6 acres and to C-2 (low-rise office) on the eastern 1.8 acres. He also applied for a special exception to permit expansion of the dealership to the area to be zoned C-6.

On September 17, 1979, after a public hearing, the Board unanimously denied the applications but placed the subject property in the R-5 classification (residential, five dwelling units per acre). This action was consistent with the recommendation of the County's planning staff and the action of the Planning Commission. About ten days later, Pyles initiated the present proceeding by filing a bill for declaratory judgment in the court below seeking a decree that he "shall have the right to use his land as requested in his rezoning application."

Following a March 1980 ore tenus hearing, the trial court ruled in Pyles' favor. In the April 1980 decree appealed from, the court held that the C-6 and C-2 zoning requested by Pyles was shown by the evidence to be reasonable and that the R-5 classification as applied to the property was unreasonable, unlawful, and void. The operation of the decree has been suspended pending appeal.

In the area in question, Route 236, a four-lane divided arterial highway, runs generally east and west with an assigned 1978 volume of about 30,000 vehicles per day. Braddock Road, a generally north-south highway intersects Route 236 approximately 2400 feet west of the subject property, which is on the north side of Route 236.

The land use along both sides of Route 236, east of Braddock Road to the subject property, is generally commercial. For example, on the south side of Route 236 moving east from Braddock Road there is a bank, a Memco department store and shopping center, a service station, an insurance office, a realtor's office, and a shoe store. On the north side of Route 236, moving east from Braddock Road, there is a service station, a real estate and insurance office, a telephone exchange, another service station behind which is a millwork business, a Ford automobile dealership (Jerry's Ford) abutting Route 236 for about 500 feet, and Pyles' dealership fronting 435 feet on Route 236.

A golf course is situated at the northwest corner of Route 236 and Braddock Road. At the southwest corner, the land is zoned R-8 (residential, eight dwelling units per acre).

North of the commercial activity along the north side of Route 236 east of Braddock Road, and about 800 feet from Route 236, is a large County park; low density, stable residential communities are farther north. Immediately behind and south of the commercial uses along the south side of Route 236 east of Braddock Road is a major low density residential community.

The subject property, improved with several residences, is a generally rectangular parcel abutting Pyles' dealership to the east. The west line is at a six-foot high brick wall which runs along the east and north boundaries of Pyles' existing business property. The south line of the site in question runs about 230 feet along Route 236 east to the boundary of a small parcel zoned C-2, the Cozo Tract. The subject property runs north from Route 236 between generally parallel lines for varying distances. The west boundary is 650 feet. The east boundary runs north along the Cozo Tract for 227 feet, then moves at an angle east for 130 feet along the north line of the Cozo Tract, then turns north at an angle running 425 feet to property zoned R-2.

Cherokee Avenue intersects from the south but does not cross Route 236 approximately 100 feet west of the west line of the subject property. East of Cherokee Avenue along the south side of Route 236, there are six residences to a point across from the Cozo Tract. East of the Cozo Tract on the north side of Route 236 is a swale, described as a "stream valley . . . which has a flood plain." Turkey Cock Run traverses this heavily wooded area and intersects Route 236 about 800 feet east of the subject property. The valley, having an east-west width of about 600 feet, contains slopes of 15 percent or greater considered undevelopable under current County ordinances.

Pyles' evidence showed the dealership has been operated at the present location since he and the operator of Jerry's Ford opened there on the same day in 1973. Both properties were zoned commercial in 1970 upon application of Ford Leasing and Development Company. Since 1975, Pyles has attempted without success to expand his dealership to provide more parking space for "customer service automobiles," employees' vehicles, and new car storage.

Pyles entered into a contract with the present owners to purchase the property, contingent on procuring the commercial zoning. Pyles' Development Plan indicates the proposed C-6 uses to be parking and new car storage on the 2.6-acre parcel with a

relocation of a private north-south road on the property to separate the C-6 and C-2 area. There will be no new buildings in the C-6. area, which fronts on Route 236, and Pyles has no plans to develop the C-2 land. Even though he plans to use only a part of the 4.4 acres, Pyles was forced to contract for the whole tract because the owners would not agree to sell piecemeal. Thus, he proposes C-2 zoning for the undeveloped piece to be compatible with the zoning of the Cozo Tract, also undeveloped since it was zoned C-2 in 1970.

Pyles' evidence further showed there has been no new residential development in the immediate area for at least 20 years. In contrast, numerous commercial rezonings have occurred during the same period along Route 236. The 1970 County Master Plan for the area between Braddock Road to the vicinity of Cherokee Avenue suggested commercial uses along most of Route 236 with the subject property designated for transitional uses, that is, "low-rise office buildings (exclusive of retail uses) or semipublic uses — townhouses." The 1975 Master Plan proposes R-5 to R-8 uses for the subject property. Pyles' evidence showed, however, that two nearby properties recently were rezoned to commercial uses contrary to the Master Plan.

Pyles' evidence emphasized that because of the predominately commercial character of the area along Route 236 east from Braddock Road to the subject property, a logical extension of the commercial zoning should be made to include the site in question. This is because, Pyles' evidence showed, the natural boundary of the commercial zone should be the wooded area east of the Cozo Tract and not an arbitrary line drawn to coincide with the six-foot brick wall at the east line of Pyles' existing premises. The proper, reasonable transitional use on the north side of Route 236 between the commercial land on the west and residential to the east, according to Pyles' expert witnesses, is commercial and not residential. In addition, Pyles' expert appraiser evaluated the 4.4 acres subdivided under a R-5 classification at $176,000. He estimated the total value of the property with the requested zoning at $802,908, with the C-2 land valued at $298,031 and the C-6 property worth $504,877.

The Board's evidence showed that during the County's 1975 comprehensive planning for the area, an analysis revealed the following facts. There was: "intense commercial activity, two auto dealerships"; an existing major buffer of park land to the north;

stable residential communities at a lower density farther north; a "spotted strip of commercial activity" on the south side of Route 236; and a major, stable low density residential community farther south. The analysis also revealed "an excess of vacant commercial zoned acreage sufficient to satisfy the existing [need]" in the area. The 1975 planning suggested residential development at four to five units per acre for the subject property and the Cozo Tract. Areas directly north and east of the site in question also were planned for residential use but at one to two units per acre.

In 1977, the County's annual plan review designated the subject property "for residential development at five to eight units per acre as a reasonable and effective transition between commercial to the west and residential to the south." In 1979, because of "continued interest and pressure for changes in the Comprehensive Plan" for the area, the County planners initiated a "major study" and designated Cherokee Avenue as "the eastern extent of commercial activity along this corridor" on the south side of Route 236. They indicated that the eastern boundary of Pyles' dealership formed "a reasonable eastern boundary north of Route 236." The County planners concluded that such boundaries together with the "residential transitions away from commercial" would effectively create reasonable limits for commercial activity and "maintain [the] area south of Route 236 as a stable low density residential community." Residential townhouses were among the transitional uses planned for the subject site. The Board's evidence further showed at least two instances where residential townhouses have developed or are planned adjacent to commercial property in the area immediately west of Braddock Road on the south side of Route 236.

The Board's evidence also demonstrated that "while there may be a number of transitional uses that one could look at in a general sense," the planned residential use for the subject property was the only "appropriate" use. The Board's expert planner was of opinion a commercial transitional use was inappropriate because it would permit "the boundaries of commercial activity to be extended farther eastward" with a considerable addition to the commercial frontage on the north side of Route 236 "directly across from the designated stable residential area." This would result, according to the witness, in destabilization and "disruption to an area that reasonably should remain single family residential." In addition, according to the Board's evidence, if the present

boundaries are violated to the east, commercial activity ultimately would spread to Turkey Cock Run stream valley, and the south side of Route 236 east of Cherokee Avenue would succumb to commercial development; this would be contrary to the planning objective in the area, which is to preserve designated stable residential communities.

The Board's expert appraiser testified the subject property could be readily developed for townhouses and that it would be worth $264,000 in a R-5 category and $396,000 in a R-8 classification. He further testified there was no "strong market" in the area for property zoned C-2, but indicated that "townhouse or commercial" development would be reasonable uses for the subject property.

The Board's expert in engineering presented site plans for R-5 and R-8 development of the subject property that complied with county engineering and zoning requirements, which he had prepared for use at the trial. The trial court questioned use of the documents on the ground the contract purchaser, Pyles, had requested C-6 and C-2 zoning and the landowners had not sought rezoning to R-5 or R-8. Noting the sales contract was void if commercial zoning was not obtained, the trial judge observed that "the County on its own is going to [saddle] an owner or owners with a R-5 or an R-8 zoning of which the owners don't want . . . [when] they have not been given a hearing." The trial judge took the view that he could not "let an R-5 or an R-8 stand without [another] public hearing," even if he ruled the board properly denied the commercial rezoning request. The Board argues, noting the owners had been present at the public hearing before the board, that it was entitled to have the evidence received and considered by the court to support its position that R-5 and R-8 were reasonable classifications for the site. The trial court ruled, however, that such evidence would be considered only on the question whether the Board acted arbitrarily and capriciously in denying the commercial zoning and would not be received to demonstrate the reasonableness of the residential zoning. This was error.

Code § 15.1-493 provides, in part:

"Before approving and adopting any zoning ordinance or amendment thereof, the governing body shall hold at least one public hearing thereon, pursuant to public notice as required by § 15.1-431, after which the governing body may

make appropriate changes or corrections in the ordinance or proposed amendment; *provided, however, that no land may be zoned to a more intensive use classification than was contained in the public notice without an additional public hearing after notice required by § 15.1-431.* Such ordinances shall be enacted in the same manner as all other ordinances." (Emphasis added.)

In the present case, following a public hearing held after proper notice on an application for commercial zoning, the Board decided to change the zoning ordinance to provide for a R-5 zoning classification, a less intensive use than either the C-6 or C-2 categories that were advertised. Such action is implicitly authorized by the foregoing proviso of § 15.1-493. When the governing body rezones to a use less intensive than the one sought in the subject application, upon which notice of hearing has been given, a second public hearing is not required. This is because as a practical matter any citizen interested in preventing the less intensive use would or should be present to be heard at the hearing on the request for the more intensive use. Consequently, the trial court should have considered the Board's evidence of R-5 and R-8 uses because it was relevant on the issue of the reasonableness of such classifications as applied to the subject property. Thus, we will so consider that evidence.

▪ Turning to the merits of the appeal, we hold the issues here are controlled by our decisions in *Fairfax County* v. *Jackson,* 221 Va. 328, 269 S.E.2d 381 (1980), and *Roanoke County* v. *International Funeral Services, Inc.,* 221 Va. 840, 275 S.E.2d 586 (1981), both decided after entry of the final decree in the present case. We apply the settled principles reviewed in *Jackson* to this case.

"The Board's action denying [Pyles'] application was legislative action; it is presumed to be reasonable. The presumption is not conclusive; it stands until surmounted by evidence that the action of the legislative body was unreasonable. And the litigant attacking the legislative act has the burden to establish unreasonableness. *Loudoun County* v. *Lerner,* 221 Va. 30, 34, 267 S.E.2d 100, 102 (1980).

" 'Legislative action is reasonable if the matter in issue is fairly debatable. *County of Fairfax* v. *Parker,* 186 Va. 675,

680, 44 S.E.2d 9, 12 (1947). An issue may be said to be fairly debatable when, measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions. *Fairfax County* v. *Williams,* 216 Va. 49, 58, 216 S.E.2d 33, 40 (1975).' *Id.*

"We have established the following test for determining whether the presumption of reasonableness should stand or fall. If the presumptive reasonableness of zoning action is challenged by probative evidence of unreasonableness, the challenge must be met by evidence of reasonableness. If such evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained; if not, the presumption is defeated by the evidence of unreasonableness and the legislative act cannot be sustained. *Fairfax County* v. *Snell Corp.,* 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974)." 221 Va. at 333, 269 S.E.2d at 384-85.

■ Upon review of a trial court's determination that the refusal of a rezoning request was arbitrary and capricious, we accord the court's finding, as in the usual case, a presumption of correctness. We also, however, give full credit to the presumption of validity of the challenged legislative action and then, meshing the presumptions, we examine the record to determine whether the evidence sustains the court's finding. *Fairfax County* v. *Jackson,* 221 Va. at 334, 269 S.E.2d at 385, quoting *Loudoun County* v. *Lerner,* 221 Va. at 34-35, 267 S.E.2d at 103.

We will agree with Pyles' contention and assume (1) the trial court properly determined C-6 and C-2 zoning was reasonable for the subject property, and (2) the contract purchaser has produced sufficient evidence to show the refusal to rezone was unreasonable. The question then becomes whether the Board produced evidence of reasonableness of the R-5 zoning sufficient to make the rezoning issue fairly debatable. It did, and the trial court erred in ruling to the contrary.

As Pyles argues, the crux of the issue is whether the zoning boundary has been fairly drawn. Fixing the specific location of boundaries between zoning districts is a legislative function that "is, by nature, more or less arbitrary." *Fairfax County* v. *Williams,* 216 Va. at 60, 216 S.E.2d at 41. In making that zoning judgment, the governing body must consider, for example, "the

general boundary guidelines" set forth in the comprehensive plan, "location of property lines, physical characteristics of the land, and other factors affecting optimum geographical alignment." *Fairfax County* v. *Snell Corp.*, 214 Va. at 660, 202 S.E.2d at 894, quoted in *Vienna Council* v. *Kohler*, 218 Va. 966, 974-75, 244 S.E.2d 542, 547 (1978). Contrary to Pyles' implicit contention, however, this does not mean that the trial court, upon reviewing legislative action, may, as here, arbitrarily disregard credible evidence that supports drawing the zoning boundary at a property line rather than within a natural boundary.

The Board presented clear, logical, and persuasive evidence which furnished a rational basis for the conclusion that the eastern boundary of Pyles' existing property should be the terminus of commercial development to the east on the north side of Route 236. As demonstrated by comments of Board members during the public hearing, the Board's concern was that additional commercial encroachment along Route 236 would adversely affect the areas immediately south of Route 236, which are part of a "total" residential community. The evidence justified that concern. In addition, the Board presented credible evidence, erroneously considered by the court below only for a limited purpose, that residential transitional uses were reasonable for the subject property to accomplish an orderly conversion from commercial uses to residential uses. Of course, Pyles' evidence was to the contrary.

■ Nevertheless, as in *Jackson* and in *International Funeral Services,* the credible evidence of the parties, all of which should have been considered by the trial court on the issues of arbitrariness *and* reasonableness, shows two uses for the subject property, both reasonable. Under such circumstances, a "fairly debatable" issue is presented and the legislative body has the right to select the zoning classification to be applied to the subject property, and to fix the zoning boundary, without interference by the courts. 221 Va. at 335, 269 S.E.2d at 386, 221 Va. at 844, 275 S.E.2d at 589.*

---

* Pyles points to the C-2 classification of the Cozo Tract and contends the Board cannot justify a denial of his request when commercial zoning has existed there, east of most of the subject property, since 1970. The ready answer to this contention involving this undeveloped parcel is that, as the Board contends, the choice of an appropriate category within a particular classification of zoning is the prerogative of the legislature. The fact that the Cozo Tract had not been developed in ten years while zoned C-2 supports the Board's decision to assign a different transitional use in the same area.

For these reasons, we hold the record fails to sustain the trial court's findings that denial of Pyles' application was "arbitrary, capricious and unreasonable" and that the R-5 zoning classification as applied to the subject property was "unreasonable, unlawful and void." Consequently, the judgment below will be reversed and Pyles' bill for declaratory judgment will be dismissed, the effect of which is to confirm the Board's decision.

*Reversed and final judgment.*