## Richmond

### Blair W. Cupp, et al.

### v.

### The Board of Supervisors of Fairfax County

Record No. 811574.

### The Board of Supervisors of Fairfax County

### v.

### Blair W. Cupp, et al.

Record No. 811632.

June 15, 1984.

Present: All the Justices.

*Thomas O. Lawson* (*W. Brewster Cockrell; Kelly, Louk, Lawson & Shumate*, on briefs), for appellants. (Record No. 811574.)

*J. Richard Tremaine, Assistant County Attorney* (*David T. Stitt, County Attorney; George A. Symanski, Jr., Senior Assistant County Attorney*, on brief), for appellee. (Record No. 811574.)

*J. Richard Tremaine, Assistant County Attorney (David T. Stitt, County Attorney; George A. Symanski, Jr., Senior Assistant County Attorney*, on brief), for appellant. (Record No. 811632.)

*Thomas O. Lawson (W. Brewster Cockrell; Kelly, Louk, Lawson & Shumate*, on brief), for appellees. (Record No. 811632.)

THOMAS, J., delivered the opinion of the Court.

These appeals of a zoning dispute raise questions of the proper use of a declaratory judgment proceeding, the power of a locality to require the dedication of land and the construction of a roadway as preconditions to the grant of a special exception under a zoning ordinance, and the constitutionality of an ordinance designed to control plant nurseries located in residential areas. The two appeals arise from the same facts, are inextricably interwoven, and are combined for purposes of this opinion.

The issues can be better understood after a recitation of the facts. Blair W. Cupp and his wife Dorothy S. Cupp owned and operated Wolf Trap Nursery, a 6.72-acre property located on Route 7 in Fairfax County. The Cupps sold plants and plant accessories, and engaged in offsite landscaping work. When the nursery went into operation in 1972, the Cupp property was zoned RE-1. As such, the nursery was a use permitted of right.

In August 1978, the Board of Supervisors of Fairfax County (the "Board") adopted an ordinance which provided that a plant nursery, such as Wolf Trap Nursery, was no longer a use permitted of right, but was instead a "Category 5 special exception use" in an R-1 district. However, this change did not immediately affect the Cupps because their business was designated a "grandfathered use." As such, the Cupps were permitted to continue to operate their business as they had always operated it in the past. Only if they replaced or enlarged any building in which the business was conducted could they be required to conform to the requirements of the new ordinance. *See* Fairfax County Code § 15-101(2).

On September 17, 1979, pursuant to a plan to modify the physical layout of their nursery, the Cupps filed an application for a special exception. On October 22, 1979, the Board adopted an amendment to the county zoning laws to draw a distinction be-

tween a "Plant Nursery" and a "Garden Center." A "Plant Nursery" was defined as follows:

> An area or establishment for the propagation, cultivation and growing of nursery stock such as trees, plants, shrubs and vines. Retail sales from the site may be permitted as an accessory use and shall be limited to nursery stock grown on the property and items designed solely to maintain and preserve the life and health of nursery stock such as fungicides, insecticides, chemicals, peat moss, humus, mulches and fertilizers. Retail sales of items not designed solely to maintain and preserve the life and health of nursery stock such as garden tools, hoses, pottery, statues and bird baths shall be deemed a GARDEN CENTER and shall be prohibited. Landscape contracting of nursery stock grown on the property shall be permitted as an accessory use.

If the Cupps relinquished their grandfathered status, this definition would require that they stop selling certain accessories such as sprayers, hand tools, and plastic pots which they had sold since the inception of the business.

In a report dated December 5, 1979, the staff of the Fairfax County Planning Commission (the "Staff") recommended that the Cupps' application be approved subject to certain conditions including the following:

5. Construction of a deceleration/right turn lane for entrance to the plant nursery; and
6. Dedication of right-of-way to 100 feet from the centerline for a third eastbound lane and a standard service drive, the exact amount of dedication to be set by DEM at the time of site plan review. Construction of the third lane and the service drive can be deferred until such time as the site redevelops.

In addition to the two conditions relating to road improvements, the Staff recommended that the approval of the application "not relieve the applicant from compliance with the provisions of any applicable ordinances regulations or adopted standards."

The day after the Staff made its report, December 6, 1979, the Cupps' counsel wrote the County Planning office stating, "I would like the record to reflect that the applicants object to the require-

ments of the dedication of a right-of-way up to 100 feet from the centerline of Route 7 and the construction of a deceleration right turn lane at the entrance." The County wrote back on January 4, 1980, confirming that the road dedication and construction requirements would be imposed and advising that unless the Cupps immediately came into compliance with the October 22, 1979 amendment by refraining from the sale of plant accessories, the Staff would recommend that the application be denied. The Cupps responded, by counsel, in a letter dated January 10, 1980. Therein, they took issue with the County's position that the Cupps were required to stop selling plant accessories:

> [I]t is my client's position that even if the SE is approved, his business will continue as a grandfathered, nonconforming use and the new ordinance would not be applicable to him. All Mr. Cupp seeks to do is rearrange his facilities in a more efficient manner with a diminuous [sic] amount of expansion and to continue doing what he has been doing for the last seven years. He is not seeking to expand his operation in terms of the activities that are conducted thereon.

Additionally, in that same letter, the Cupps reiterated their objection to the land dedication and road construction requirements. In support of their position they cited *Hylton* v. *Prince William Co.*, 220 Va. 435, 258 S.E.2d 577 (1979).

The County wrote a reply on January 23, 1980. In it the County retreated from its position that the Cupps would have to conform to the plant nursery definition prior to the approval of their application. The County's new position was "that if the special exception is approved it must come into compliance with the current Zoning Ordinance definition and regulations for plant nurseries." The County disputed the Cupps' contention that if the application were approved, Wolf Trap Nursery would continue its grandfathered status. The County said that position was in error. Finally, the County said it would not change its position "regarding improvements to Route 7." The Cupps wrote back, by counsel, in a letter dated January 29, 1980. In that letter they objected

> to the staff's interpretation of the ordinance for the conditions that would attach to the special exception result in an unwarranted confiscation of a portion of Mr. Cupp's business and, therefore, would be illegal and void. Obviously these

conditions would seriously damage his business and he would be foolish to accept the special exception under these circumstances.

The Cupps again noted their objection to the required dedication and road improvements, calling them "unreasonable, illegal and not related to the public health, safety and welfare." They stated that the road requirements were particularly unfair because the modifications to the business were so minor "that they will not measurably impact the public welfare or safety, particularly traffic on Route 7." Finally, the Cupps reiterated their position that they had a "vested right" to continue their business without securing a special exception. The County did not reply to this letter.

Thereafter, Blair Cupp sent a letter to the County which he had personally prepared. In his February 4, 1980 letter, Mr. Cupp complained that the ordinance which defined plant nurseries was unrelated to the public health, safety, and welfare. He strongly objected to the application's being conditioned upon the dedication of land and the construction of a roadway. He said that if the County wanted the land, it should pay for it. He asked why he should have to pay for a road that is generally needed by the public but not specifically required because of his business. He pointed out that while 34,956 vehicles used Route 7 each day, he averaged only 25 customers per day. He stated that there had been no accidents at the entrance to his property for as long as he had been in business. There was no response to this letter.

The Cupps' application was considered by the Board on March 10, 1980. Their counsel advised the Board that a number of conversations had been had with the Staff "in attempting to work out some sort of an amendment that my client could live with." He stated that these efforts had been unavailing. He recounted his clients' position that their business predated the new ordinance and that they were "not able to live with the Staff's interpretation as to the effect of that . . . ordinance on this SE." He then asked the Board to deny the application: "[w]e would ask the Board to turn down this application . . . which may sound a bit unusual to you but we are not able to economically, it's not feasible for us to live with it. . . ."

The Staff testified that the application should be approved subject to the conditions set forth in its December 5, 1979 report which included the requirement that land be dedicated and a

roadway built. Questions were asked by certain of the Board's members concerning the Cupps' request that their application be denied. The Cupps' counsel made clear that his clients were not withdrawing their application but wanted it voted "up or down." He explained that the position he took was because of the Staff's conditions and interpretations. He stated: "In view of the interpretation of the Staff — that the Staff is giving to the ordinance and the development plan conditions which are attached to this, it's just not economically feasible to the Cupps to go ahead with the project."

Approximately one month after the Board denied the application, the Cupps filed a motion for declaratory judgment wherein they challenged the Board's authority to impose the conditions relating to the dedication and construction of a road. In addition, they challenged the constitutionality of the October 22, 1979 amendment to the zoning ordinance concerning plant nurseries. The Board responded with a plea in bar in which it contended that no controversy existed because the Cupps had "requested denial of their Special Exception." The Board also filed an "Answer and Grounds for Defense." The trial court denied the plea in bar and the case was tried to the court.

The court ruled that the Cupps could maintain the suit and that the ordinance concerning plant nurseries was unconstitutional. The court also ruled that the road dedication and construction requirements were valid. On appeal, the Cupps contend, in essence, that the trial court erred in finding the dedication and construction requirements valid. The Board contends that the Cupps did not have standing, that there was no controversy between the parties, and that the zoning ordinance was constitutional. We think the Cupps had standing and that they stated a case cognizable under the Declaratory Judgment Act, that the road dedication and construction requirements were invalid, and that the ordinance complained of was constitutional.

## I. *Standing and Alleging a Controversy Under the Declaratory Judgment Act*

The county advances two lines of attack against the trial court's decision to consider the Cupps' claims. In the Cupps' appeal, record no. 811574, the Board assigned as cross-error the trial court's finding that there existed "a case or controversy between the parties when the·Complainants applied for a special exception to the

zoning ordinance, the county staff suggested approval with conditions, the Complainants requested denial of their application and the Board complied with their request." In the Board's appeal, record no. 811632, the Board assigned error to the trial court's finding that the Cupps had standing. The Board stated that "the individual lacked standing by virtue of his failure to allege or prove how he was harmed by definitions which were adopted by the Board of Supervisors." The two points raised by the Board are dissimilar, yet, within the context of this case, related.

## A. Standing

We do not agree that there is a standing problem concerning the Cupps. The concept of standing concerns itself with the characteristics of the person or entity who files suit. The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case. *See* 2 C. Antieau, *Modern Constitutional Law* § 15:23 (1969). In asking whether a person has standing, we ask, in essence, whether he has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed. The United States Supreme Court has described standing in the following terms:

> The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such *a personal stake in the outcome of the controversy* as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."

*Duke Power Co.* v. *Carolina Env. Study Group*, 438 U.S. 59, 72 (1978) (quoting *Baker* v. *Carr*, 369 U.S. 186, 204 (1962)) (emphasis added).

In two recent opinions, we discussed standing within the context of declaratory judgment actions; those opinions shed light on the proper disposition of the instant issue. In *Fairfax County* v. *Southland Corp.*, 224 Va. 514, 297 S.E.2d 718 (1982), a case relied upon by the Cupps, the county contended that Southland had no standing to attack a certain statute which restricted the construction of "quick-service" stores such as the "7-Eleven"

stores operated by Southland. The county claimed that Southland had never made any application under the ordinance which it sought to have declared unconstitutional. Southland contended that it did not need to make an application under the ordinance in order to attack it because the very application process itself was allegedly unconstitutional and that merely to apply would cost Southland several thousand dollars as well as delay. On those facts, we found that Southland had standing. We concluded that it had a justiciable interest in the subject matter of the suit. We said that Southland's interest in attacking the ordinance was neither hypothetical nor abstract.

We likewise found standing in *Henrico County* v. *F. & W., Inc.*, 222 Va. 218, 278 S.E.2d 859 (1981). There, an option holder regarding certain land sales contracts sued to have declared unlawful the down-zoning of the property on which it held options. The county contended that as a mere option holder, F. & W. did not have standing to pursue its declaratory judgment action. We said this about standing: "A plaintiff has standing to bring a declaratory judgment proceeding if he has 'a justiciable interest' in the subject matter of the litigation, either in his own right or in a representative capacity." 222 Va. at 223, 278 S.E.2d at 862 (citing *Lynchburg Traffic Bureau* v. *Norfolk & Western Railway*, 207 Va. 107, 108, 147 S.E.2d 744, 745 (1966)). We explained that F. & W.'s interest in the viability of its options was sufficient to give it standing.

Here, the Cupps owned Wolf Trap Nursery and the land on which that business operated. They had a direct stake in any ordinance that would curtail or control what they could sell in their business. They were directly affected by any condition that would require them to turn over a portion of their land to the County. In terms of a personal stake, it is plain that if any party were in a position to challenge governmental activity affecting Wolf Trap Nursery and the Cupp property on Route 7, it would be the Cupps.

Despite the foregoing, the Board contends, on the strength of *Gayton Triangle* v. *Henrico County*, 216 Va. 764, 222 S.E.2d 570 (1976), and *City of Fairfax* v. *Shanklin*, 205 Va. 227, 135 S.E.2d 773 (1964), that the Cupps did not have standing. The Board's reliance on those two cases, with regard to standing, is misplaced. They did not address the issue of standing. *Gayton Triangle* was an exhaustion-of-remedies case. *Shanklin* concerned the nature of

the controversy and whether the court should have taken jurisdiction. None of the cases cited by the Board holds that a property owner does not have standing to complain of government action that affects or threatens to affect his particular property.

## B.  *Actual Controversy*

■ The second issue raised by the Board concerns whether this was a proper case for review in a declaratory judgment proceeding. To resolve this issue we must focus upon the Declaratory Judgment Act, Code §§ 8.01-184 *et seq.* According to Code § 8.01-184, it is not every case that can be reviewed in a declaratory judgment proceeding. Review is limited to "cases of actual controversy," which are described later in the same provision as instances of "actual antagonistic assertion and denial of right."

The Board contends that because the Cupps requested that their application be denied, and because the Board merely granted that request, there exists no conflict between the Cupps and the Board and therefore no declaratory judgment proceeding can be maintained. The Board's simplistic argument glosses over all the events that led up to the vote by the Board. In a series of written reports and letters stretching from December 5, 1979, through February 4, 1980, the parties carefully staked out their positions. The Board made clear that it thought it had the power to impose land dedication and road construction conditions and that it would exercise that power. The Cupps made equally clear that they disputed the Board's authority concerning the dedication and construction requirements. The Cupps even went so far as to cite case authority to the Board.

With regard to the applicability of the "plant nursery" definition, the Board took the position that upon the approval of the application, the Cupps would have to cease selling all items not authorized for sale under the October 22, 1979 amendment to the ordinance. The Cupps' position was exactly contrary; they claimed the ordinance did not apply to them and if it did it was unconstitutional.

In his letter of January 29, 1980, the Cupps' counsel emphasized that the only reason the Cupps wanted the Board to vote on their application was so that the Cupps could not thereafter be accused of failing to exhaust their administrative remedies. He wrote as follows: "It has been the position of my client and continues to be his position that he seeks the special exception (without

the conditions and legal interpretation given to it by the staff) only as a method of exhausting his administrative remedies. . . ." Thus, the Cupps' request that their application be denied never was intended to end the controversy between them, but to lay the predicate for court review. The two parties were in dispute from the beginning and remained so after the Board's denial of the Cupps' application.

█ In our view, this is a classic example of a case contemplated by the Declaratory Judgment Act. In this regard, Code § 8.01-191 comes into play; it reads as follows:

> This article is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, *without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor.* It is to be liberally interpreted and administered with a view to making the courts more serviceable to the people.

(Emphasis added.) Here the Cupps were uncertain about what would happen the moment their application was approved. They did not want to run the risk of losing what they had — their grandfathered status — in an effort to find out whether the Board had the power to impose the conditions and apply the ordinance in the manner suggested by the Staff. The only step left was for the Board to invade the rights of the Cupps or vice versa. Such a situation is what declaratory judgment is aimed at avoiding. What we said in *Liberty Mutual Ins. Co.* v. *Bishop*, 211 Va. 414, 421, 177 S.E.2d 519, 524 (1970), applies with equal force here:

> The intent of the declaratory judgment statutes is not to give parties greater rights than those which they previously possessed, but *to permit the declaration of those rights before they mature.* In other words, the intent of the act is to have courts render declaratory *judgments which may guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights, which action, without direction, would jeopardize their interests.* This is with a view rather to avoid litigation than in aid of it.

(Emphasis added.)

■ The Board's authorities do not detract from our conclusion, they support it. The principal case relied on by the Board is *City of Fairfax* v. *Shanklin*, 205 Va. 227, 135 S.E.2d 773 (1964), which is cited for the proposition that a matter is not justiciable where the claim is based upon future facts. Though that proposition is generally true, it has no application here. This case arose from a genuine dispute that threatened harm to the Cupps. The nature of the dispute is documented in the communications between the parties. There is no suggestion from the Board that it would have approved the application without imposing the conditions and restrictions suggested by its Staff. Indeed, the Board joined issue with the Cupps regarding its power to require the conditions and to enforce the ordinance against them.

This case is more like *Fairfax County* v. *Southland Corp.*, 224 Va. 514, 297 S.E.2d 718 (1982), where we decided that Southland could litigate the constitutionality of an ordinance even though it had not made an application under that ordinance. We concluded there that an actual controversy existed and that the trial court had subject matter jurisdiction. Also pertinent is *Bd. Sup. James City County* v. *Rowe*, 216 Va. 128, 216 S.E.2d 199 (1975). There, a property owner complained of a zoning ordinance that would severely restrict the development of his property. The county claimed, among other things, that the landowner had failed to allege a justiciable controversy. We disagreed and in so doing, we wrote as follows: " 'The legality of an ordinance is tested not only by what has been done under its provisions but what may be done thereunder.' " 216 Va. at 132, 216 S.E.2d at 205 (quoting *City of Winchester* v. *Glover*, 199 Va. 70, 72, 97 S.E.2d 661, 663 (1957)). In the instant appeal, then, although the Board is correct in stating that it had not yet imposed the restrictions and conditions on the Cupps, it claimed it had the power to do so and this claim of power threatened the Cupps. Thus, a controversy, within the contemplation of the Declaratory Judgement Act, existed.

## II. *The Land Dedication and Road Construction Requirements*

■ The Board claimed it had the power to require the Cupps, as a condition to approval of their application, to dedicate land to the county and to build a right-turn lane and service road. It argues that the source of its authority is Code § 15.1-491 which reads in pertinent part as follows:

A zoning ordinance may include, among other things, reasonable regulations and provisions as to any or all the following matters:

. . .

(c) For the granting of special exceptions under suitable regulations and safeguards; and notwithstanding any other provisions of this article, the governing body of any city, county or town may reserve unto itself the right to issue such special exception or use permit.

We find nothing in this language which empowers the Board to impose the road dedication and construction requirements which it claimed it was empowered to impose. In Virginia, we adhere to Dillon's Rule and a corollary thereto, that "the powers of boards of supervisors are fixed by statute and are limited to those conferred expressly or by necessary implication." *Hylton* v. *Prince William Co.*, 220 Va. 435, 440, 258 S.E.2d 577, 581 (1979). The right to grant special exceptions "under suitable regulations and safeguards" does not imply the power to require a citizen to turn land over to the county and build roads for the benefit of the public.

Moreover, even it we assume that the Board had the authority, in a proper case, to impose such a condition, it could not do so in this case because the dedication and construction requirements were unrelated to any problem generated by the use of the subject property. The evidence established that approximately 35,000 vehicles per day used Route 7 but that Wolf Trap Nursery averaged only 25 customers per day. Of Wolf Trap's approximately 150 customers per week, 70% came on weekends and the bulk of the remaining 30% came between 11:00 a.m. and 3:00 p.m., that is, during the non-rush-hour periods. Mr. Cupp testified that the modification to the layout of the business would not expand the services offered nor increase the number of customers. He also testified that no accidents had occurred at the entrance to the driveway. Moreover, a witness for the Board admitted that the dedication and construction requirements were not imposed because of any problem generated by the Cupp property, but because of general conditions prevailing along Route 7.

The Cupps contend that our decisions in *Bd. Sup. James City County* v. *Rowe*, 216 Va. 128, 216 S.E.2d 199 (1975), and *Hylton* v. *Prince William Co.*, 220 Va. 435, 258 S.E.2d 577 (1979), have

resolved the question whether dedication and construction requirements, not generated by the use, can be imposed. We think that *Rowe* is virtually on all fours with the present problem; therefore, we will rely upon it. *Hylton*, though related, concerned a subdivision development; therefore, it is factually distinct.

In *Rowe*, the landowner complained of an ordinance that required him, prior to development, to dedicate a 55-foot-wide stretch of land fronting on Route 60 in James City County. We held that requirement to be invalid. We wrote as follows:

> The precise question before us is *whether a local governing body has the power to enact a zoning ordinance that requires individual landowners, as a condition to the right to develop their parcels, to dedicate a portion of their fee for the purpose of providing a road, the need for which is substantially generated by public traffic demands* rather than by the proposed development. Our enabling statutes delegate no such power. Moreover, Article I, § 11, of the Constitution of Virginia expressly and unequivocally provides "that the General Assembly shall not pass any law . . . whereby private property shall be taken or damaged for public uses, without just compensation." *The dedication requirement of 8A offends that constitutional guarantee, and we hold that it is invalid.*

216 Va. at 138-139, 216 S.E.2d at 208-209 (emphasis added).

In addition to the dedication requirement, the ordinance in *Rowe* required the landowner to construct a service road. The county contended that under its general police power, it could require the construction of the road. We said the police power, while flexible, could not stretch that far because if it did, "no property right, indeed, no personal right, could co-exist with it." *Id.* at 139, 216 S.E.2d at 209. We stated that as a general proposition, when the government takes property from a citizen it should pay for it. We held as follows:

> The Board cites nothing in the constitution, enabling statutes, or case law of Virginia which empowers the sovereign to require private landowners, as a condition precedent to development, to construct or maintain public facilities on land owned by the sovereign, when the need for such facilities is not substantially generated by the proposed development.

The private money necessary to fund the performance of such requirements is "property", and we hold that such requirements violate the constitutional guarantee that "no person shall be deprived of his life, liberty, or property without due process of law. . . ." Constitution of Virginia, Art. I, § 11.

*Id.* at 139-140, 216 S.E.2d at 209. On the strength of *Rowe*, it is plain that the dedication and construction requirements could not be imposed by the Board.

### III.   *The Constitutionality Of the Plant Nursery Ordinance*

■ The Cupps contend that the October 22, 1979 amendment to the zoning ordinance which attempted to draw a distinction between "Plant Nurseries" and "Garden Centers" was unconstitutional on its face and as applied. The trial court agreed with the Cupps' position and ruled in their favor. Upon our review of the ordinance, we reject the proposition that it is unconstitutional on its face. We perceive nothing inherently wrong in the County's effort to limit commercial encroachments into residential areas. No fundamental rights are affected, no suspect categories are impinged upon, no impermissible classifications appear to be created. We find nothing in the ordinance which makes it "unreasonable in itself without regard to any particular property." *See Rowe*, 216 Va. at 133, 216 S.E.2d at 205, n.4 (citing 2 A. Rathkopf, *The Law of Zoning and Planning* at 35-7 to 35-10 (1972)).

■ The Cupps' attack on the ordinance must be limited to its legality, as applied. In that regard, it is important to consider the burden of proof that rests upon a party who claims that an ordinance is unconstitutional. We stated the principle in *Board of Supervisors* v. *Carper*, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959):

The general principles applicable to a judicial review of the validity of zoning ordinances are well settled. *The legislative branch of a local government in the exercise of its police power has wide discretion in the enactment and amendment of zoning ordinances. Its action is presumed to be valid so long as it is not unreasonable and arbitrary. The burden of proof is on him who assails it to prove that it is clearly unreasonable, arbitrary or capricious, and that it bears no*

*reasonable or substantial relation to the public health, safety, morals, or general welfare. The court will not substitute its judgment for that of a legislative body, and if the reasonableness of a zoning ordinance is fairly debatable it must be sustained.*

(Citations omitted.) In *Fairfax County v. Jackson*, 221 Va. 328, 334, 269 S.E.2d 381, 385 (1980), we quoted from *Loudoun County v. Lerner*, 221 Va. 30, 34-35, 267 S.E.2d 100, 103 (1980), in describing how this Court accommodates the presumption of correctness of a trial court's finding in light of the presumption of constitutionality of a legislative enactment:

Upon review of a trial court's finding that the denial of a rezoning request is unreasonable, we accord the court's finding, as with the usual case, a presumption of correctness, but we also give full credit to the presumption of validity of the legislative action involved in the denial and then, assimilating the two presumptions, we examine the record to determine whether the evidence sustains the court's finding. *See Fairfax County v. Williams*, 216 Va. at 52, 58, 216 S.E.2d at 36, 40. *In other words, the presumption of validity of legislative action does not disappear when a trial court finds that the action is unreasonable; the presumption accompanies the legislative action when the latter is brought to this court for review, and it is viable until this court holds with the trial court that the legislative action is unreasonable.*

(Emphasis added.) On the facts of this case, we do not "hold with" the trial court that the legislative action was unreasonable.

The Board's evidence disclosed that the amendment to the ordinance was adopted in response to the problem of ever increasing commercialism of plant nurseries located in residential sections of the county. The county had held public hearings in June and July 1979 concerning the problem. In addition, there was evidence that the Staff met with various citizens' groups to discuss the problem of commercialism in residential areas.

The amendment was discussed again at a Board of Supervisors meeting on October 10, 1979. Several of the witnesses acknowledged that a problem existed with regard to commercialism rearing its head in residential areas. One witness, the president of the Northern Virginia Nurserymen, said he was impressed with "the

thoughtfulness that has gone into coming up with this definition." Another nurseryman argued that the ordinance should be drafted so as not to destroy the small nurseries. Significantly, this witness suggested that where a nursery is small, low volume, and *"where they don't sell anything but the material they grow and give advice,"* they should be allowed to continue. (Emphasis added.)

In essence, the Board's evidence established that a problem existed that required the attention of the Board through the zoning laws and that procedures were adopted to ensure public input on combatting the problem of commercialism.

The Cupps' evidence of unreasonableness is as follows: the ordinance would prevent them from selling items such as sprayers, hand tools, books, and pots which they had traditionally sold. Sale of the items prohibited under the plant nursery definition accounted for 4.5% of sales in 1978, 2.68% of sales in 1979, and 3.06% of sales in the first 6 months of 1980. The remainder of their sales in 1978, 1979, and 1980 was made up of plants, landscaping work, or chemicals — all permissible items. Mr. Cupp also testified that he thought if he were not allowed to sell accessories he would lose many of his customers. He offered no evidence in support of this conclusion.

On all the evidence, we think the Cupps failed to prove either the unreasonableness of the ordinance or the reasonableness of the approach they suggested. They would argue that because they might lose approximately 4.5% of their sales, the County should not be allowed to apply an ordinance to them that has the overall aim of maintaining the noncommercial character of residential sections of the county. It is manifest to us that the reasonableness of the ordinance, as applied to the Cupps, is fairly debatable. Therefore, it must be upheld.

## IV.

We hold that the Cupps had standing and that they alleged a controversy under the Declaratory Judgment Act; that the land dedication and road construction requirements were unconstitutional and therefore invalid; and that the ordinance complained of was constitutional on its face and as applied.

Therefore, the order of the trial court will be affirmed in part, reversed in part, and the case remanded for entry of a declaratory judgment not inconsistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*