## Seabrooke Partners

### v.

## City of Chesapeake

Record No. 890754

June 8, 1990

Present: All the Justices

*Grover C. Wright, Jr.* for appellant.

*William F. Devine (Robert C. Nusbaum; Patrick C. Devine, Jr. Ronald S. Hallman, City Attorney; Jan Proctor, Assistant City Attorney; Hofheimer, Nusbaum, McPhaul & Samuels*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

In this appeal, we determine whether a piecemeal reduction of permissible residential density, a so-called downzoning, from multi-family to single-family residential use was justified on the ground of the surrounding neighborhood's changed circumstances.

On February 21, 1969, the Planning Commission of the City of Chesapeake approved a property owner's preliminary subdivision

plat of a 34-acre tract of land on Bells Mill Road in the City of Chesapeake. The plat reflected the proposed division of the 34-acre tract into 64 single-family lots, consistent with the property's then-existing single-family zoning classification.

On May 13, 1969, upon the property owner's petition, the City Council for the City of Chesapeake rezoned the 34 acres to a multi-family classification. This classification was later designated as R-MF1 in the comprehensive zoning ordinance adopted May 27, 1969. However, no part of the 34 acres was ever developed for multi-family use.

In early 1976, the property owner submitted a preliminary subdivision plat of approximately half the 34 acres, indicating that this portion would be developed for single-family housing to be known as Seabrooke Landing, Section One. On March 10, 1976, the planning commission approved the preliminary plat, conditioned upon the parcel being rezoned to "R-15S" (single-family dwellings situated on minimum 15,000-square-foot lots). On September 8, 1976, upon the owner's petition, the city council downzoned section one to an R-15S classification. The owner later obtained planning staff approval of the two separate plats of phases one and two of section one and had them recorded.

On December 30, 1976, the owner submitted a preliminary subdivision plat of the remainder of the 34 acres for planning commission approval. Designated as Seabrooke Landing, Section Two, this plat reflected a subdivision consisting of 36 single-family residential lots.

On January 19, 1977, the owner's agent was advised of the plat's approval, but was reminded of the need to rezone section two to R-15S, as had been required as a condition for the planning commission's approval of section one. Thereafter, the owner recorded its plat of phase one of section two, consisting of 19 single-family residential lots. The owner did not, however, seek to have any part of section two rezoned.

A number of purchasers built and occupied single-family houses on more than half the lots indicated on the three plats.[1] In December 1981, the owner conveyed what would have been phase two of section two to Seabrooke Development Co. Inc. (Seabrooke Corp.). This remainder of the original 34 acres, an area of ap-

---

[1] Chesapeake's comprehensive zoning ordinance permitted less intensive use of property that was specifically zoned for a more intensive use. Thus, several single-family houses were built in the R-MF1 zone encompassing section two, phase one, of Seabrooke Landing.

proximately 9.88 acres, has a long, narrow configuration extending approximately 1,400 feet along the northern edge of section two, phase one, with a depth of approximately 225 feet. Because no subdivision plat of the 9.88 acres had been recorded, it was conveyed as one parcel.

Later, Seabrooke Corp. was dissolved, and the 9.88 acres were conveyed to its three stockholders, operating as Seabrooke Partners (Partners). In August 1987, Partners contracted to sell the 9.88 acres to Marsh Harbour Pointe, Inc. At this time, the sale of the 9.88 acres was apparently conditioned upon continued RMF-1 zoning. Shortly after the contract was executed, Marsh Harbour submitted an application for site plan approval to the planning commission, indicating that the 9.88 acres would be developed as an apartment complex. Before the planning commission had decided upon Marsh Harbour's application, the city council downzoned the 9.88 acres[2] from RMF-1 to R-15S on February 16, 1988.

Contending that the downzoning was invalid because there had been no change of circumstances in the neighborhood to justify the city council's action, on February 17, 1988, Partners and Marsh Harbour filed a petition for declaratory judgment and injunctive relief. Marsh Harbour later withdrew from the suit. On March 28, 1989, following a two-day trial, the trial court sustained the city's downzoning decision. We granted this appeal to Partners, limited to the issue whether the downzoning was justified on the grounds of mistake[3] or change of circumstances.

The principles of review on appeal of a case such as this are well settled. We view the evidence in the light most favorable to the city, the prevailing party in the trial court, and accord a presumption of correctness to a trial court's finding in a zoning case. *West* v. *Mills*, 238 Va. 162, 168, 380 S.E.2d 917, 920-21 (1989); *Fairfax County* v. *Pyles*, 224 Va. 629, 638, 300 S.E.2d 79, 84 (1983). Furthermore, the city's legislative act in downzoning the 9.88 acres is presumed reasonable. *Fairfax County* v. *Snell Corp.*, 214 Va. 655, 658-59, 202 S.E.2d 889, 892-93 (1974).

The legal principles that apply in the trial of downzoning cases are also well settled:

---

[2] In fact, all of section two, comprising approximately 19 acres, was downzoned. However, we are concerned only with the downzoning of the 9.88 acres belonging to Partners.

[3] We do not decide the issue of mistake in view of our ruling upon the other issue.

> [W]hen an aggrieved landowner makes a *prima facie* showing that since enactment of the prior ordinance there has been no change in circumstances substantially affecting the public health, safety, or welfare, the burden of going forward with evidence of such mistake, fraud, or changed circumstances shifts to the governing body. If the governing body produces evidence sufficient to make reasonableness fairly debatable, the ordinance must be sustained.

*Id.* at 659, 202 S.E.2d at 893. In this case, the dispute focuses upon whether the residential character of the neighborhood had changed since the R-MF1 zoning classification was adopted in 1969.

Partners' planning expert, Albert J. Stodghill, characterized the neighborhood as extending for some distance east and west of the 9.88 acres and approximately one-half mile north and south of Cedar Road. Cedar Road is a major arterial road situated at least 2,000 feet south of the 9.88 acres. Referring to the variety of single and multi-family units in the neighborhood, as thus defined, Stodghill testified that the neighborhood contained a mixture of high and medium density subdivisions. Accordingly, he opined that there had been no change in the circumstances of the neighborhood which justified downzoning Partners' 9.88-acre parcel.

■ In our opinion, this evidence was sufficient to make a *prima facie* showing that there had been no change of circumstances since the zoning classification of the 9.88 acres as RMF-1 in 1969. Therefore, the issue becomes whether the city produced sufficient evidence of a change in neighborhood circumstances to make the issue fairly debatable.[4]

In contrast to Stodghill's definition of the "neighborhood," the city's evidence indicated that the relevant neighborhood was the original 34-acre tract and the immediately adjacent area, which is predominantly zoned for single-family housing.[5] The city contended that this area represented a discrete residential neighborhood unto itself.

---

[4] We disagree with Partners that the city council abused its discretion in denying Partners' proposed "mix" of single and multi-family zones for the entire 34 acres, yet permitting such a mixture in other neighborhoods. Those other neighborhoods were substantially larger, with opportunity for more adequate buffering between the two zones.

[5] A church has been built immediately north of the 34 acres, but the record does not disclose when it was built.

■ Generally, the definition of appropriate neighborhood boundaries is a factual determination for the legislative body involved. *See* 2 E. Ziegler, *Rathkopf's Law of Planning & Zoning*, § 28A.02[2][a] (4th ed. 1985). Obviously, two adjoining lots in a city could not be considered a neighborhood, nor could an entire county, which may include several towns. However, given the size of the area embraced by the city's definition of the neighborhood, we cannot say that the city's factual determination was wrong.

■ There can be little doubt that the neighborhood, as defined by the city, has changed since 1969. Partners' predecessor developed most of the 34 acres as single-family housing. If the 9.88 acres were developed as Partners urges, it would be an "island" of multi-family housing. It would be surrounded by single-family dwellings already located on the balance of the 34 acres, and by other areas planned and zoned for single-family housing, as well. Thus, it is fairly debatable that these changed circumstances would "substantially [affect] the public health, safety, or welfare. Such a change [is] objectively verifiable from evidence." *Snell Corp.*, 214 Va. at 660, 202 S.E.2d at 894.

■ Accordingly, we conclude that the city produced sufficient evidence to make the reasonableness of its action in downzoning the 9.88 acres fairly debatable. Therefore, the action of the trial court in sustaining the downzoning will be

*Affirmed.*