## CIRCUIT COURT OF WARREN COUNTY

Freezeland Orchard Co., Inc.,
and The Roscoe Group, L.L.C.

v.

Warren County
Board of Supervisors

January 15, 2001

Case No. (Law) 00-210

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court for hearing on January 10, 2001, on an appeal of the Board of Supervisors' denial of a conditional use permit for a retreat center, golf course, and other attendant facilities in an agricultural zoning district. The parties appeared with their counsel: Joseph F. Silek, Jr., and John Roscoe, Esquires, appeared for the Petitioners; and Douglas W. Napier, Esquire, appeared for the Respondent. No additional evidence was

heard, all the prefiled exhibits were admitted into the record, and the evidence in the record was argued by counsel.

Upon consideration whereof, the Court has made the following decision to affirm the Board's decision denying the conditional use permit and to dismiss the Petitioners' appeal.

## I. *Statement of Material Facts*

The following facts are in the record in this case. References to the record appear as "PX" (Petitioners' Exhibit) and "RX" (Respondent's Exhibit).

### A. *Material Proceedings*

On January 19, 2000, Petitioner, The Roscoe Group, L.L.C. (hereinafter the "Roscoe Group") filed a Conditional Use Permit application to allow the Roscoe Group to construct a golf course, retreat facility, and facilities for artisans and craftsmen and trades (hereinafter collectively "the Project") on property owned by Petitioner, Freezeland Orchard Company, Inc. As originally filed, the application proposed a large project on the property of 722 acres: 276 acres for a golf course, 45 acres for a retreat facility and lodge, 54 acres for single family residences, 40 acres for a vineyard, 5 acres for an artisan village, and undisturbed land of 40 acres. The golf course was to have 18 holes and would include a clubhouse with a restaurant. The lodge would also have a restaurant. The retreat facilities would include a number of chalets and cottages that would not be used for full-time occupancy. The main lodge would include no more than 120 rooms and suites for the purpose of accommodating guests. The vineyard would include a wine tasting facility for visitors and customers. The proposal called for the Property to be served by a central water and sewer system to be built by the developer. Water would be supplied by a series of wells, impoundments of springs and streams on the Property, and reuse of waste water. The application was amended by the Roscoe Group several times during the course of its consideration by the County. In its final form, the application excluded all single family residences, other than a few to house staff serving the Project, and all chalets and cottages from consideration.

The proposed project appeared to be of high quality (RX 1C), and the Petitioners submitted a very professional presentation in support of their application. *See, e.g.* RX 2, Traffic Impact Analysis; RX 53 SAIC Water Management Plan.

The first Staff Report of the Warren County Planning Director raised questions about the availability of water, the potential impact on surrounding property, and the need for more study and information. RX 24.

The application was reviewed by the Planning Commission at its March 8, 2000, meeting, when the Planning Commission voted in favor of authorizing the application for public hearing. The application generated considerable public interest both for and against the proposed project. The Planning Commission held a public hearing on April 12, 2000, at which hearing, numerous people spoke for and against the application. At the conclusion of the public hearing, the Planning Commission voted to table the action on the application until the call of the Chairman to permit the Commission and staff to study the issues raised at the public hearing.

The Planning Commission reconvened its meeting on May 3, 2000. Due to concerns expressed by a Commission member that he had received additional documentation concerning the application too late for him to review thoroughly, the Planning Commission moved to table the action on the application until May 25, 2000.

On May 25, 2000, the Planning Commission voted 3 to 2 to forward the application to the Board of Supervisors with a recommendation to approve the conditional use permit request with the conditions as presented by County staff dated May 16, 2000, with some additional conditions proposed by the Planning Commission.

The Warren County Board of Supervisors held a public hearing on the application on August 8, 2000. At this public hearing, numerous people spoke both for and against the application. At the conclusion of the public hearing, the Board of Supervisors voted to table action on the application until September 5, 2000, for further discussion and study, and to have the opportunity to review forthcoming reports from the Virginia Department of Environmental Quality ("DEQ") and from the Army Corps of Engineers.

At its September 5, 2000, meeting the Board of Supervisors voted 3 to 2 to deny the application. Incident to their votes, the Supervisors who voted for denial of the projects made statements of varying length and character addressing their concerns about the proposed use of the property. RX 134. The Board of Supervisors' motion which was passed expressly referred to the applicable legislative standards. RX 135.

Freezeland and the Roscoe Group appealed the decision of the Board of Supervisors on October 6, 2000.

B. *The Warren County Zoning Ordinances*

The Agricultural (A) District allows certain uses to be permitted as a matter of right. Warren County Code § 180-21.B.[1] The proposed vineyard and winery are permitted uses in the agricultural district, and the petitioner could subdivide its property into five acre lots. Other uses in the Agricultural (A) District are permitted only upon issuance of a conditional use permit by the Board of Supervisors. Warren County Code § 180-21.D. A golf course in the Agricultural (A) District requires a conditional use permit. Warren County Code § 180-21.D(9).

Warren County Code § 180-63.A(2) provides that:

> The Board of Supervisors may approve a conditional use permit . . . when it is concluded that the proposed use complies with all specified standards and that such use will be compatible with existing or planned development in the general area. In approving a conditional use permit, the Board of Supervisors may stipulate such conditions and restrictions . . . to ensure that the use will be compatible with the area in which it is proposed to be located. Where such cannot be accomplished or it is determined that the use is not in accordance with all applicable standards of this chapter, the Board shall deny the conditional use.

Warren County Code § 180-63.D provides that all conditional uses shall satisfy the following general standards:

> The proposed use of the specified location shall be in harmony with the adopted Comprehensive Plan.
>
> The proposed use shall be in harmony with the general purpose and the intent of the applicable zoning district regulations.
>
> The proposed use shall be such that it will be harmonious with and will not adversely affect the use or development of neighboring properties in accordance with the applicable zoning district regulations and the adopted Comprehensive Plan.

---

[1] This section specifically provides that "This district is intended for areas where general agricultural pursuits are practiced, where low density residential developments may be situated without degrading the environment and, where expanses of open space best exist for parks, playgrounds, game preserves, and similar uses."

The proposed use shall be such that pedestrian and vehicular traffic associated with the use will not be hazardous or in conflict with the existing and anticipated traffic in the area.

Adequate utility, drainage, parking, and other necessary facilities that serve the proposed use shall be provided.

Warren County Code § § 180-63.D(6)1 provides that:

In determining whether or not to grant a [conditional use] permit and in determining conditions to be imposed, the governing body shall take into consideration the objectives and the intent this chapter may impose reasonable restrictions that:
(a) Abate or restrict noise, smoke, dust, or other elements that may affect surrounding properties. . . .
(c) Provide for adequate . . . ingress and egress to public streets or roads. . . .
(e) Prevent such use from changing the character and established pattern of development in the community.

All applications for conditional use permits shall include a site plan, an environmental impact statement, a community impact statement, and any other information deemed necessary by the Zoning Administrator, the Planning Commission, and/or the Board of Supervisors in order for the Planning Commission and the Board of Supervisors to determine the impact that the application, if granted, would have on the community as a whole and adjacent properties in particular, taking into account the purpose and intent of the Warren County zoning ordinances set forth in Warren County Code § 180-2. Warren County Code § 180-64.A(1).

The Planning Commission and/or the Board of Supervisors may require the review of the application, environmental impact statement, and community impact statement, including hydrology and transportation studies, by third-party consultants, approved by the Planning Commission or the Board of Supervisors at the expense of the applicant. Warren County Code § 180-64.A(7).

Each conditional use permit application must contain an environmental impact statement. An environmental impact statement shall be performed by a certified engineer or another person qualified to perform such work. The environmental impact statement must include an inventory, which evaluates the existing characteristics and conditions of the environment including but not limited to the effect of the applied for use, to a reasonable degree of

scientific probability, on water (surface, underground, and springs) both as to the specific property for which the application is being made, as well as to the properties within a radius of one-half mile from the subject property. To determine the effect of the applied for use on water, the Planning Commission or Board of Supervisors may require hydrology studies, including pump and/or draw down tests, to be conducted for up to two months, both on the subject property as well as properties within the aforesaid radius from the property. The Planning Commission or Board of Supervisors may require such hydrology study to be conducted by a qualified hydrologist selected by the Planning Commission or Board of Supervisors at the expense of the applicant. The inventory shall also include a study of the atmosphere, natural processes (such as erosion, and precipitation), flora, fauna, land use (including wildlife habitat, wetlands, forestry, grazing, agriculture, residential, and commercial), recreation, ascetics and human interest (including scenic views and vistas, wilderness qualities, open space qualities and unique physical features), and manmade facilities and activities (including transportation facilities and waste disposal). Environmental impact statements shall also include a study of the impact upon the area by the proposed activity, including modification of the natural environment (including modification of the wildlife habitat, alteration of groundwater hydrology, alteration of drainage, river and stream control and flow modification, and irrigation), land transformation and construction (including dams and impoundments), resource extraction, land alteration (including marsh fill and drainage), resource renewal (including groundwater recharge and waste recycling), changes in traffic, and waste storage and treatment. Warren County Code §§ 180-64.A(1); 180-64(1) and (2).

*C. Material Facts in the Record Supporting the Board's Action*

Freezeland owns about 722 acres of mountaintop land on the southeastern ridge of Blue Mountain on the west side of the Blue Ridge Mountains. The elevation of the Property is from approximately 1250 feet to 1750 feet above sea level. The Property consists of rolling terrain, and it presently contains an orchard, pasture, and forest. The Property was used as a commercial apple orchard from about 1907 to 1996. Approximately 460 acres of this property are in Warren County, and 262 acres are in Fauquier County. The Property is currently zoned Agriculture (A) by the Warren County Zoning Ordinance.

The Property is bounded as follows: Skyland Estates subdivision, a residential community containing 1819 lots and several hundred occupied homes, lies to the southwest; Shenandoah Farms subdivision, a residential community containing 4304 lots and about 1000 occupied homes, lies to the north; also lying to the north is the Kenny Wood subdivision, containing 24 lots and several occupied homes; to the northwest lies the G. Richard Thompson Wildlife Management Area owned by the Commonwealth of Virginia, containing approximately 4000 acres; to the east and southeast, the Property is bounded by a number of large parcels of privately owned land located in Fauquier County.

The Property is accessed from the south by State Secondary Route 638, which to the south of the Property is a paved two-lane road leading from State Route 55 approximately four miles up Blue Mountain. Route 638 to the north of the Property is presently unimproved with a stabilized surface. Based on current conditions, most trips to and from the proposed Project would have to be from the south from Route 55. Route 638 currently averages 1406 vehicle trips per day. The proposed development would at least double the traffic count on that road. According to the Virginia Department of Transportation, the present Route 638 roadway has extremely steep grades and at some locations does not meet VDOT's current geometric design standards for both vertical and horizontal alignment. Narrow shoulder width and inadequate sight distances at various locations are also problems. According to VDOT, to compound the problems of substandard geometrics, Route 638 is severely impacted during inclement weather, including extreme drifting of snow, which at times can make driving hazardous. *See generally* RX 117, 122-124. The Petitioner agreed to pay for the cost of improvements to Route 55 and Route 638 which VDOT hoped would mitigate some of the adverse impacts the proposed Project would have on Routes 638 and 55. VDOT stated that the increased traffic caused by the Project would have a significant adverse affect on the adjacent public roadway network. At the public hearings, members of the public said that Route 638 was already overcrowded, narrow, and dangerous.

The Petitioner proffered a number of conditions with its Conditional Use Permit application to attempt to ameliorate potential adverse impacts the Project might have on roads, groundwater, surface water, and the Project's neighbors. These included making entrance signalization and roadway improvements suggested by VDOT and constructing and maintaining a central water and sewer system. Water for the potable water needs of the Project would come from wells dug on the Property. No well water would be used for non-potable or irrigation purposes. The primary non-potable water source

would be surface water and spring discharge from the fifty plus springs on the Property. All withdrawal wells would be at least 500 feet from a portion of the Property boundary that borders Skyland Estates Subdivision. Observation wells would be drilled to attempt to monitor possible diminishing water flows to the withdrawal wells and to attempt to determine impacts in groundwater sources supplying neighboring subdivision domestic users. The conditions stipulated that, should the Project's withdrawal wells threaten the water supply of any residential properties within one thousand feet of any withdrawal wells, the County would reserve the right to require a slowdown or cessation of pumping from that well until the County determined that the data no longer indicated a threat to the water supply of those properties. All streams exiting the Property would be monitored and flows in those streams must continuously be in conformance with a 7 Q 10 (seven day, ten year flow) standard. The applicant agreed to post a $100,000.00 performance bond with corporate surety to cover costs of neighbors' replacement wells, should they be needed because of groundwater depletion caused by the Project. If withdrawal from wells adversely affected the offsite flow of surface waters within 500 feet of the withdrawal wells, the County could require cessation or slow down of the pumping of water from the wells.

The Roscoe Group presented evidence through its geologist consultant, Science Applications International Corporation (SAIC), that the potable water needs of the Project could safely be met by withdrawal of groundwater by wells. The Roscoe Group also presented evidence through SAIC that the non-potable water needs of the Project could be safely met by impoundment of springs and streams on the Property and by capture and use of recycled waste water.

In essence, the petitioners contend that this case was a battle of the experts and that their experts' opinions are better founded on the facts and on generally accepted scientific principles than the opinions of other scientists who stated opposing or negative opinions about the project. As a general observation, all of the experts were primarily extrapolating their data from general sources as opposed to having actual knowledge of the nature, extent, and capacity of the aquifer under Blue Mountain.

Although disputed by the Roscoe Group and its consultant, SAIC, there was credible evidence presented to the Board of Supervisors which disputed or called into doubt whether the Project could be built without negatively impacting the environment and neighboring residences' water supplies and whether the Project would have sufficient supplies of groundwater and surface water to meet the Project's needs. Note the following.

Nick H. Evans, Ph. D., P.G., Senior Geologist with the Virginia Department of Mines, Minerals, and Energy, stated that the estimates of groundwater recharge volume on the Property to be "highly conjectural and misleading." RX 71. *See generally* RX 71-75. The Property is located in the Catoctin Greenstone Formation, a geologic area which has a fractured rock groundwater system. The abundance of springs on the property suggest that recharge to the fractured bedrock aquifer is not very efficient in this area. The structure of the bedrock and topography predicts not very efficient groundwater recharge. A well field testing program might not present a realistic picture of recharge efficiency. In this area "perched aquifers" may occur. These perched aquifers may contain substantial volumes of stored water, but once that volume has been pumped out, replenishment by recharge is very slow. Dr. Evans has had personal experiences with perched aquifers in Catoctin Greenstone in mountain settings in central Virginia, where testing had indicated abundant water but heavy use in practice soon depleted the water supply. Dr. Evans counseled the County to proceed with caution, and he warned that it is difficult to make an informed decision as to the appropriate scope of development on the Property without better information regarding groundwater availability and recharge capacity. He stated that information would only begin after wells are drilled and tested. Dr. Evans stated that protection of the domestic water supply in Skyland Estates should be a prime concern. Dr. Evans stated continuous monitoring and keeping of records pertaining to the observation wells and stream flows would be required. He stated that surface water demands for irrigation on the Property will substantially exceed water available from natural flow during the dry months of the year. This deficit could only be made up by storing water in a series of ponds. The only feasible catchment basin for creating surface water impoundments is that of an unnamed tributary feeding Manassas Run. The volume of water that will legally be required to be released from that impoundment is likely to be greater than the 7 Q 10 proposed by the Petitioner. Dr. Evans could not determine if such a series of ponds would actually be feasible on site.

Dr. Evans stated that, given the complexities of fractured rock aquifers, it is a difficult challenge to design a monitoring program that truly protects the interests of adjoining property owners.

Dr. Evans noted that, given that there likely would not be enough water required for irrigation purposes, the golf course would be brown, and not a lush green, during dry periods.

Dr. Evans noted that there are many examples in the greater Charlottesville area alone where groundwater-based community water systems have turned out to have inadequate design capacities. This has led to a rapid expansion of the public supply service area, at considerable public expense.

John P. Rice, Jr., C.P.G., Senior Hydrologist, Principal with the ENSAT Corporation, was retained by the Piedmont Environmental Council to do a hydrogeological study to determine if there is adequate surface and groundwater to meet the Project's needs. *See generally* RX 69-70, 133.

Mr. Rice stated that actually developing reliable wells in the Catoctin formation can be problematic due to the poorly developed network of water-bearing fractured zones in some areas of this formation. Mr. Rice pointed out two inherent weaknesses in the siting patterns and possible usage of the potential well sites SAIC located on the property. All proposed well sites are located in the axis of surface water drainage swales, which is the area of maximum groundwater supply. The Health Department, he noted, will almost certainly not allow the wells to be located in these swales due to the possibility of surface water contamination. Moving the wells away from the swales will almost certainly reduce yields, possibly substantially.

Second, most of the proposed wells lie adjacent to the active springs on the Property. Heavy groundwater pumping will reduce the springs' flows, which would pose logistical concerns for supplying the Project (which is now to rely heavily on surface water), as well as possibly causing negative downstream ecological effects due to reduced stream flows. The actual use of the water resources, both surface water and groundwater, will be heavily focused in a few key areas, and the impacts of such usage will also be focused, resulting in decreases in groundwater, storage, and surface water flows. This would necessitate the drilling of a larger number of groundwater wells (and associated monitoring wells) across the Property in order to obtain the needed supply.

Mr. Rice noted that surface water impoundments would be needed to meet the non-potable requirements of the Project. However, the topography of the Property is such that only the headwater stream of Manassas Run is a viable, potential catchment for a surface water impoundment capable of storing significant quantities of water. The amount of surface water stated by the Petitioner that it needed for its minimum requirements for the Project is 5.2 times larger than the rate of water supply to the impoundment by Manassas Run's catchment area. Therefore, the water captured by a hypothetical impoundment on Manassas Run would not be sufficient to safely meet the long-term non-potable water demands of the Project.

Mr. Rice also stated that the Petitioner's reliance on its utilization of a low flow limit for water release from their impoundments equal to the 7 Q 10 for each affected stream was not likely to be feasible. The 7 Q 10 is a statistically determined low flow rate that would occur over a seven-day period in a ten-year recurrence interval. Such a minimal release to Manassas Run might persist over a long portion of the irrigation season, might cause negative ecological effects to the stream, and might not be approved by the appropriate regulatory agencies.

Mr. Rice commented on the Petitioner's intent to use waste water as a supplementary source of non-potable water. Even if the entire 78,000 gallons per day potable water was captured as waste water and recycled, the demand would still be over three times greater than the available supply of combined water from waste water recycling and impoundment on Manassas Run during periods of maximum use.

Mr. Rice pointed out that the calculations done by SAIC did not include the large evaporative losses from the impoundments, which further significantly reduce the water supply availability.

Mr. Rice also noted that water systems on mountaintops often fail, even where potentially enough water ought to be available, because the pressure network is not well developed. For that reason also groundwater needs might not be achievable.

Andrew E. Kassoff, P.C., of Draper Aden Associates, was retained by the County as a hydrogeologic consultant to review the hydrogeologic and environmental data submitted by the Petitioner. *See generally* RX 57, 61, 63-65. Mr. Kassoff found that the Petitioner's SAIC study was very preliminary in nature. He agreed with Mr. Rice that most of the Petitioner's proposed well sites are located in areas of geologic depression and that the Virginia Department of Health will likely require their relocation, resulting in potentially lower well yields than anticipated by SAIC. Mr. Kassoff stated that the non-potable water demands of the Project are significant and will not be easily met on site. Mr. Kassoff also stated that the Petitioner's assertion that the existing apple trees use more water than would be required by the Project is unrealistic. He stated that the issue of the non-potable water supply requires much more planning than was done by the Petitioner. He stated a substantial issue was whether the federal Clean Water Act would be violated by engineered production of the springs on site, because downstream flora and fauna would likely be negatively impacted.

Mr. Kassoff stated that the possibility exists that the springs might be contaminated with pesticides from use in the apple orchard, as soils on the Property already have tested positive for DDT, lead, and arsenic.

Mr. Kassoff stated that the Project's water withdrawal wells may impact off site, preexisting wells. The Project had the potential to negatively impact both surface water and groundwater quality and quantity. Observation wells may not be able to detect impacts to off site wells. Mr. Kassoff found that the on site groundwater recharge rate assumptions used by SAIC are probably overly optimistic.

Mr. Kassoff stated that there is insufficient data available to determine if there is sufficient surface water to meet the non-potable requirements of the Project. Even if there is sufficient surface water flow present on site, the permitting process required under the federal Clean Water Act may significantly limit the volume of water available to the Project.

Mr. Kassoff stated that the assumption made by the Petitioner that waste water may be used is speculative. He noted that the act of spray irrigation is regulated under the Virginia Pollution Abatement Program and that program has some very specific and arduous engineering requirements that typically render the concept of irrigation of a golf course with effluent financially unfeasible.

Mr. Kassoff stated that due to the lack of fundamental information, the evaluation of surface water supply is dominated by assumptions and speculation, which cannot substitute for data. It would be considered prudent and conservative to assume that, in the absence of site-specific data, surface water supplies will not be available to meet the Project's demands, he concluded.

John Rizzo, a retired physicist who has studied the issue of geology and hydrogeology of the Catoctin Greenstone formation for years and a member of the Warren County Well and Septic Systems Board of Appeals, pointed out to the Planning Commission and the Board of Supervisors that the hydrogeology of the Blue Ridge Mountains is poorly understood because no systematic studies for these geologies have ever been conducted, as has been noted by the United States Geological Survey. Having reviewed the various studies, he was very critical of the data which allegedly support the water estimates of the developer. *See generally* RX 29, 133, 139.

The Virginia Department of Environmental Quality (DEQ) reviewed much of the material submitted by SAIC and was asked by the County to comment on whether the Project has sufficient surface water to supply the non-potable uses of the Project. *See generally* RX 115-16. It was the opinion of DEQ that the Project is probably marginal in that regard. DEQ pointed out that a risk for the County in approving the Project is that, if water resources proved to be insufficient to support the development, the County may be asked by citizens to step in with the expense of extending water and sewer lines.

The Virginia Department of Health, Office of Water Program, noted that the Petitioner's environmental impact statement waste storage and treatment discussion refers to treatment of well water, surface ponds, and runoff ponds by means of nanofiltration and ozonation. At the present neither method has unconditional approval in the Commonwealth. The Office of Water Programs also noted that the SAIC hydrogeologic evaluation does not appear to consider the impact of this demand on adjoining users. *See generally* RX 127, 128.

Evidence was also presented that the project could adversely affect the rural, mountain environment. The Virginia Native Plant Society and a professor of biology at a state college both wrote letters to the Board of Supervisors to warn them of the danger presented by the proposed Project to the unique ecology of the area. *See* RX 174, 175. They pointed out that the G. Richard Thompson Wildlife Management area was placed under registry as one of Virginia's outstanding botanical sites. It is the home to possibly the largest colony of the trillium wild flowers in the country. The increased traffic, fragmentation of forest lands, clearing of trees and pollution would be damaging to the health of these flowers. In addition, the site has seepage spring areas that are not only unusual in this region but are vital ecosystems for several rare plants. This development could bring serious adverse impacts on these sites. When the site was registered in 1990, scientists in the Virginia Department of Conservation and Recreation Natural Heritage Program included the precaution that maintenance of current groundwater quantity and quality is of utmost importance to insure the long-term viability and diversity of the seepage communities. The constructions of roads, digging of groundwater wells, hard surfacing or diversion of surface runoff from the groundwater recharge areas, which did not then exist, present the greatest potential threats, the scientists noted.

The Virginia Native Plant Society also pointed out the area is in an extremely important throughway for migratory birds such as hawks and warblers, whose populations are diminishing nationally in the wake of developments similar to the one in question.

The Board of Supervisors could find on the evidence presented to them that the Project was inconsistent with the Comprehensive Plan in any of the following regards.

The Comprehensive Plan calls for the protection and conservation of fragile groundwater resources within the County's unique hydrology. The Catoctin Greenstone area is a unique geologic area, which has been noted as having limited groundwater resources.

The Comprehensive Plan calls for protection of the County's wetland resources, including springs. This site contains several noted springs. Development of the site could negatively impact these springs. In addition, the proposed use of the surface water could allow natural flow to be degraded to the extent that the integrity of the streams and springs flowing from the mountain would no longer be protected.

The Comprehensive Plan calls for the identification and protection of important plant and wildlife habitats, including aquatic life. It has been noted that the site includes rare trillium flower fields, which extend from the G. Richard Thompson Wildlife Management area to the site. Evidence was presented that the proposed development would negatively impact the seepage swamp communities, as well as the trillium fields.

The Comprehensive Plan also calls for directing County development to areas contiguous with the Town of Front Royal or rural villages that are served or will be served with adequate public facilities such as roads, sewer, and water. The proposed development is not contiguous with the Town of Front Royal or the village of Linden. Evidence was presented that the Project would not be served with adequate public facilities such as roads, sewer, and water.

The Comprehensive Plan calls for the discouragement of growth in environmentally sensitive areas that have natural development constraints, such as wetlands, steep slopes, harsh terrain, and flood plains. The site of the proposed development is located along the top of Blue Mountain. The site includes spectacular views and vistas. The site contains important native flora, such as trillium, and seepage swamp communities. The site contains some areas that would be considered steep slopes. The site is underlain by the Catoctin Greenstone formation. This formation is known for low availability of groundwater.

The Comprehensive Plan calls for the direction of the majority of future growth towards those areas where public facilities are adequate or facilities can be constructed efficiently. There are no public facilities within approximately 5 miles of the site. Further, there is a dispute based on the evidence presented as to whether public facilities can be constructed efficiently on the site.

## II. *Conclusions of Law*

The purpose of zoning is "to promote the health, safety, morals, and general welfare of the community, to protect and conserve the value of buildings, and encourage the most appropriate use of the land." *City of*

*Richmond* v. *Board of Supervisors*, 199 Va. 679, 686, 101 S.E.2d 641 (1958). "[T]he General Assembly of Virginia has undertaken to achieve in the enabling [zoning] legislation a delicate balance between the individual property rights of its citizens and the health, safety, and general welfare of the public as promoted by reasonable restrictions on those property rights." *Board of Supervisors* v. *Horne*, 216 Va. 113, 120, 215 S.E.2d 453 (1975).

In its legislative discretion, the Board of Supervisors may "specify certain uses, which it considers to have a potentially greater impact upon neighboring properties or the public, than those uses permitted in the district as a matter of right, to undergo the special exception process. Each site is to be examined by public officials, guided by standards set forth in the ordinance, for the impact the use will have if carried out on that site." *Board of Supervisors* v. *Southland Corp.*, 224 Va. 514, 521-22, 297 S.E.2d 718 (1982). A conditional or special use permit "refers to the power or the state [which was delegated to the county] to set aside certain categories of uses which are to be permitted only after being submitted to governmental scrutiny in each case, in order to insure compliance with standards designed to protect neighboring properties and the public." *Fairfax County v. Southland Corp.*, 224 Va. 514, 521, 297 S.E.2d 718 (1982). A zoning ordinance may include reasonable regulations and provisions for the granting of special exceptions or conditional use permits under suitable regulations and safeguards. Virginia Code § 15.1-491(C). This is expressly provided for by Warren County Code § 180-63.A(1).

In this case, a winery as proposed is a permitted use of the property as are other agricultural uses. "To make a *prima facie* showing that the denial of a conditional use permit is unreasonable, a landowner must show not only that the use he requests is reasonable but that the existing zoning ordinance, as applied to his land, is unreasonable." *City Council of Virginia Beach v. Harrell*, 236 Va. 99, 102, 372 S.E.2d 139 (1988). See also *Board of Supervisors v. IFS*, 221 Va. 840, 843, 275 S.E.2d 586 (1980), where a property owner failed to satisfy his requisite threshold burden of proof where the property owner's "own evidence showed that, while its [the owner's] proposed use may be reasonable, the use permitted under current zoning is also reasonable." In *Fairfax County v. Jackson*, 221 Va. 328, 335, 269 S.E.2d 381, 386 (1980), the Supreme Court stated:

> The question is not merely whether the refusal to [grant a use permit] is unreasonable. Rather, the more precise inquiry is whether the landowner or the legislative body has the right to select the [use] when the [use permitted by right] and the

proposed [use] are both reasonably [appropriate for] the subject property. To pose the question is to answer it.

When, as here, the [use permitted by right] and the [proposed use] are both appropriate for the lot in question, a classic case of a "fairly debatable" issue is presented. *Under such circumstances, it is not the property owner, or the courts, but the legislative body which has the prerogative to choose the [appropriate use].*

(Emphasis added.)

In land use cases, no economically viable use of the property means that "the government's action deprives the landowner of all economic use of the land." *Helmick v. Town of Warrenton*, 254 Va. 225, 233, 492 S.E.2d 113 (1997). The Petitioners have not provided clear proof that the existing zoning ordinance as applied to Freezeland's land is unreasonable. *City Council of Virginia Beach v. Harrell*, 236 Va. 99, 102, 372 S.E.2d 139 (1988). *Board of Supervisors v. IFS*, 221 Va. 840, 843, 275 S.E.2d 586 (1980). In this case, the landowner could operate the proposed winery as a matter of right and further subdivide the property into five acre residential lots. The issue is not whether the landowner may make the highest and best use of the property but whether the landowner may make a viable economic use of the property under the existing zoning.

In *County Board of Arlington v. Bratic*, 237 Va. 221, 226-29, 377 S.E.2d 368 (1989), the Supreme stated:

> [T]he exercise of the power to grant or deny a use permit is "a legislative, rather than an administrative[,] act." *Id.* at 522, 297 S.E.2d at 722. . . . "The standards of judicial review applicable to zoning enactments also apply to actions taken by a local governing body on an application for a conditional use permit."

*Harrell*, 236 Va. at 102, 372 S.E.2d at 141.

There are two currents of constitutional jurisprudence determining the scope of judicial review of a legislative decision of the Board of Supervisors. The first and foremost of which is the concept of separation of powers. "Judicial review of legislative acts must be approached with particular circumspection because of the principle of separation of powers, embedded in the Constitution." *Ames v. Town of Painter*, 239 Va. 343, 389 S.E.2d (1990) (review of board of zoning appeals decision) *citing Telephone Co. v. Newport News*, 196 Va. 627, 639, 85 S.E.2d 345, 352 (1955). The Board of

Supervisor's legislative action ruling on an application for a conditional use permit "is presumed to be valid and will not be disturbed by a court absent clear proof that the action is unreasonable, arbitrary, and bears no reasonable relationship to the public health, safety, morals, or general welfare." *Virginia Beach v. Harrell*, 236 Va. 99, 101, 372 S.E.2d 139 (1988).

The second constitutional current influencing the scope of judicial review in this case is the substantive due process principle that legislative power may not be arbitrarily and capriciously exercised. Zoning laws are promulgated and administered pursuant to the government's police power. 83 Am. Jur. 2d, *Zoning and Planning*, § 4.

> Because the police power is the least limitable of the exercises of government, such limitations [on the power] are not readily definable. These limitations can be determined, therefore, only through appropriate regard to the subject matter of the exercise of that power.

*The Constitution of the United States of America Analysis and Interpretation*, Congressional Research Office Library of Congress, pp. 1580-81, 1996.

If a legislative act is reasonable, it is not arbitrary, and the test of "fairly debatable" has developed to measure the propriety of the legislative action under scrutiny. Recently, in *Gregory v. Board of Supervisors*, 257 Va. 530, 514 S.E.2d 350 (1999), the Supreme Court affirmed the denial of a rezoning request, and, in doing so, it again restated the principles governing judicial review of legislative zoning actions by local government units:

> If the applicant's challenge is met by the board with evidence of reasonableness sufficient to render the issue fairly debatable, then the legislative action must be sustained. *Wendy's of Western Va.*, 252 Va. at 15, 471 S.E.2d at 471; *Bratic*, 237 Va. at 227, 377 S.E.2d at 371; *Jackson*, 221 Va. at 333, 269 S.E.2d at 385. A matter is fairly debatable if, when evaluated by quantitative and qualitative measures, the evidence in support of the opposing views could lead objective and reasonable persons to reach different conclusions. *Wendy's of Western Va.*, 252 Va. at 15, 471 S.E.2d at 470-71; *Board of Supervisors v. Pyles*, 224 Va. 629, 638, 300 S.E.2d 79, 84 (1983).

*Id.* at 537-38.

To produce consistent results and therefore permissive judicial review according to an objective standard, the reviewing court must review the record to assess both the quantum and the quality of the evidence. This review function is the daily grist of appellate courts. In this case, the petitioners have argued that the Board of Supervisors could not consider any of the expert evidence, except that which they produced, on the premise that their evidence was more scientifically valid, which would require the court to weight the evidence. When a court rules on a motion to strike, it is required to assess the legal sufficiency of the evidence and make a threshold ruling whether the case may go to the jury. In *Austin v. Shoney's, Inc.*, 254 Va. 134, 138, 486 S.E.2d 285 (1997), the Supreme Court stated that:

> The standard under which a trial court should review the evidence adduced at trial before granting a motion to strike the case at the end of a plaintiff's evidence is well settled under prior decisions of this Court. That standard requires the trial court to accept as true all the evidence favorable to the plaintiff as well as any reasonable inference a jury might draw therefrom which would sustain the plaintiff's cause of action. *The trial court is not to judge the weight and credibility of the evidence, and may not reject any inference from the evidence favorable to the plaintiff unless it would defy logic and common sense.*

The Board of Supervisors' decision is entitled to at least the same deference as a jury verdict or a judge's decision, so the reviewing court is not to judge the weight and the credibility of the evidence, but simply its sufficiency.

In the civil context there are many quantitative measures of the evidence: scintilla, some, substantial, preponderance, and clear and convincing, and lack of evidence as measured by the lower end of the scale is generally what triggers judicial review. A scintilla of evidence is not sufficient to support a jury instruction or a verdict. *See Commonwealth v. Donkor*, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998) (more than a scintilla of evidence is required to support a jury instruction). Nor will "a [land use] decision . . . be upheld where it is supported by only a scintilla of evidence. . . ." 83 Am. Jur. 2d, *Zoning and Planning*, § 1064. As a general rule, the quantum of evidence required to support a land use decision of a legislative body is that of substantial evidence. *See* 83 Am. Jur. 2d, *Zoning and Planning*, §§ 1062 and 1063. The substantial evidence quantum is one which the appellate courts in this state apply in other contexts: "the scope of court review of a litigated issue under the [Administrative Process Act (APA)] is limited to determination [of]

whether there was substantial evidence in the agency record to support the decision." *State Bd. of Health v. Godfrey*, 223 Va. 423, 433, 290 S.E.2d 875, 880 (1982) (citing Code § 9-6.14:17). In applying the concept of appellate review to determine whether substantial evidence supports the decision under review, the Supreme Court has stated that the substantial evidence standard is "designed to give great stability and finality to the fact-findings of an administrative agency." *Virginia Real Estate Comm'n v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983). A trial court may reject the findings of fact "only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." *Id.* (quoting B. Mezines, *Administrative Law*, § 51.01 (1981)). *Bias, supra,* at 269. Certainly, a legislative body like the Board of Supervisors is entitled to the same, arguably more, consideration as an administrative tribunal. *See I.D.A. v. LaFrance Cleaners*, 216 Va. 277, 280, 217 S.E.2d 879, 883 (1975) ("exercise [of] legislative prerogatives within its plenary grant of authority will be upheld even though its action was 'fairly debatable' "); *Bristol Redev. & Housing Auth. v. Denton*, 198 Va. 171, 176-77, 93 S.E.2d 288 (1956) (the Supreme Court affirmed the trial court's decision enjoining a municipal slum clearing project on the ground that the authority's determination that the area to be razed was a slum was arbitrary and capricious); and *Jamerson v. Womack*, 244 Va. 506, 509-10, 423 S.E.2d 180 (1992) (judicial review of 1991 voting reapportionment act).

If true deference is to be accorded legislative actions and if the burden on the landowner is simply to make a "prima facia showing that the denial of the conditional use permit was unreasonable. . . ." *City Council of Va. Beach v. Harrell*, 236 Va. 99, 102, 372 S.E.2d 139 (1988), then the converse is that only evidence sufficient to make a "prima facia" showing of "fairly debatable" is required to support the board's decision; therefore, if deference is truly to be accorded to the legislative actions of the Board of Supervisors, a legislative decision of the Board of Supervisors in a land use case will only be reversed, if, "considering the record as a whole, a reasonable mind would necessarily come to a different conclusion."

What is the "qualitative measure of the evidence" to which the appellate courts refer? Obviously, it must be a concept distinct from the quantum of evidence. At first blush, it might be thought to refer to the weight of the evidence as the Petitioners argue in this case, but it cannot be the weight, competency, or admissibility of the evidence, because it is for the legislature to establish its rules to determine what evidence it will consider and to weigh the competing evidence and arguments, and the courts are not to second guess the legislature. *See Wagner Enters., Inc. v. Brooks*, 12 Va. App.

890, 894, 407 S.E.2d 32, 35 (1991) ("The appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses."). In land use hearings, the Board of Supervisors is not limited to the expert testimony presented, and the courtroom rules of evidence governing the admissibility and weight to be accorded expert opinions and the consideration of the other evidence are not controlling in the legislative forum. *See A.T. & T. Wireless PCS v. Virginia Beach*, 155 F.3d 423, 430 (4th Cir. 1998). If the "qualitative measure" is not the quantum, weight, admissibility, or competency of the evidence, the only qualitative attribute of evidence which is left is that of relevance, that is, the evidence in the record must be some evidence that has a "logical tendency, however slight, to prove a fact at issue in the case." Friend, *The Law of Evidence in Va.*, § 11-2 (1999). Accordingly, the "quantitative and qualitative measure" of the evidence for judicial review of a legislative action in a land use case is that there must be substantial evidence in the record that has a logical tendency, however slight, to generate potential differences in opinions among reasonable persons on the issues which are material to the decision. *See* 83 Am. Jur. 2d, *Zoning and Planning*, § 1065.

Having distilled these review principles to their essence and given the separation of powers doctrine and the fact that the appellate courts have developed the "fairly debatable" as a separate standard for review of legislative acts as opposed to applying the review standard which they apply to their review of judicial decisions, a good case can be made for the proposition that the "fairly debatable" standard is a lower standard of review than the appellate standard of review for judicial decisions. Like many words in the English language, the adverb "fairly" has several meanings, and "fairly debatable" in the context of judicial review of legislative actions means "moderately or tolerably" debatable. *See Random House Unabridged Dictionary* (2d ed. 1993). The Supreme Court has recognized the fecundity of the human mind in discerning differences and drawing inferences and its readiness to engage in dialectic discussions of those perceived differences: "Given the human tendency to debate any question, an issue may be said to be *fairly* debatable when the evidence in support of the opposing views would lead objective reasonable persons to reach different conclusions." *Fairfax County v. Williams*, 216 Va. 49, 58, 216 S.E.2d 33 (1975).

Having contemplated the legal and lexical character of the standard of review, this court has reviewed the record to see whether there is substantial evidence in the record that has a logical tendency to support the board's denial of the conditional use permit. "Local governing bodies, because of their knowledge of local conditions and needs of their individual communities, are

allowed wide discretion in the enactment . . . of zoning ordinances. The Court should not substitute its judgment for that of the local legislative body unless there has been a clear abuse of power." *Byrum* v. *Orange County*, 217 Va. 37, 39, 225 S.E.2d 369 (1976). This same principle applies to this court's review of the record in this case. The Petitioners have argued that the record does not show that the Board of Supervisors actively debated the issue and that the Board of Supervisors did not articulate specific reasons for their actions indicating that they had weighed the evidence. There is no statutory requirement that the Board of Supervisors debate an issue among themselves before they act. In making legislative zoning decisions, the only reasons that the Board of Supervisors are required to state or consider are the general statutory considerations, and they are not required to specifically articulate their underlying purposes or reasons or the specific facts upon which they relied in forming their judgment. *See Fairfax County v. Southern Iron Works,* 242 Va. 435, 442-43, 410 S.E.2d 674 (1991) (in its resolution, the board found that the four purposes set forth in the governing code provisions required revision of the zoning ordinance). This is the same procedure employed in this case. *See* RX 134, 135. In this regard the Board of Supervisors is different from a board of zoning appeals to whom the board has delegated some of its legislative authority and therefore must make specific findings of fact. *See, e.g., Toon v. Board of Zoning Appeals*, 54 Va. Cir. 33 (Fairfax 2000).

"A fairly debatable question is presented 'when the evidence offered in support of the opposing view would lead objective and reasonable persons to reach different conclusions'." *City of Manassas* v. *Rosson*, 224 Va. 12, 17, 294 S.E.2d 799 (1982), *appeal dismissed* 459 U.S. 11, 66, 103 S. Ct. 809, 74 L. Ed. 2d 1009 (1983). The *Rosson* Court noted, "In making its decision in this type of case, a legislative body may consider the necessity of keeping residential areas free of disturbing noises, increased traffic, the hazard of moving and parked vehicles, and interference with quiet and open spaces for child-play." *Id.* at 19. In this case, the Board was very concerned about the increase in traffic on a rural road, the fundamental change wrought by the construction of a golf course and retreat center, which is tantamount to a hotel, on a highly visible mountaintop in an agricultural district, and about the concentration of wells in an aquifer whose performance was not known but rather was projected based upon theoretical estimates of the effect of water withdrawal on adjoining properties. There was substantial evidence in the record on all of these issues sufficient to support the Board of Supervisor's decision to deny the application for a conditional use permit, and only one

material issue if supported by substantial evidence is sufficient to support the board's decision to deny the application.

The Warren County Zoning Ordinance has detailed provisions relating to the issuance of a conditional use permit. In addition to the specific standards set forth in the zoning ordinance, all such conditional uses shall satisfy the following general standards: (1) the proposed use at the specified location shall be in harmony with the adopted comprehensive plan; (2) the proposed use shall be in harmony with the general purpose and intent of the applicable zoning district regulations; (3) the proposed use shall be such that it will be harmonious with and will not adversely affect the use or development of neighboring properties in accordance with the applicable zoning district regulations and the adopted comprehensive plan; (4) the proposed use shall be such that pedestrian and vehicular traffic associated with such use will not be hazardous or in conflict with the existing and anticipated traffic in the area; (5) adequate utility, draining, parking, loading, and other necessary facilities to serve the proposed use shall be provided; (6) in determining whether or not to grant this permit and in determining conditions to be imposed, the governing body shall take into consideration the objective intent of the Warren County Zoning Ordinance. Warren County Code § 180-63(B). These factors were recited as the basis for the motion to deny the application (RX 135), and the record reveals that there was ample evidence in the record from which the Board could have drawn inferences and conclusions adverse to the Project's approval.

The fact that the applicant obtained Virginia Department of Transportation approval of its entrances onto State Route 638 does not preclude the Board of Supervisors from exercising its legislative judgment in determining that the proposed use of the road will be hazardous or in conflict with the existing and anticipated traffic in the area. The Board of Supervisors heard extensive public input at its public hearings that the traffic that would result from the proposed use would add to an already dangerous situation caused by too many cars on a narrow and dangerous stretch of road. In this case, the construction of the golf course and the retreat center required a special use permit, and among the factors to be considered are that "the proposed use shall be such that . . . vehicular traffic associated with such use will not be hazardous or in conflict with the existing and anticipated traffic in the area." Warren County Code § 180-63.D(5). The Board shall also take into consideration "intent of the chapter . . . and prevent such use from changing the character and established pattern of development in the community." Warren County Code § 180-63.D(6)(E).

In the case before the Court, the evidence presented to the Board of Supervisors was sharply conflicting as to whether the proposed development would have adequate surface waters available for irrigation for a golf course; whether the use of ground and surface water withdrawals would have an adverse affect on neighboring property owner's wells, on streams and springs flowing from the property, on nearby properties' flora and fauna, and on the seepage swamp flora community; on whether the road network would be adequate to safely and conveniently support the proposed development; and whether the development would alter the established nature and character of the residential community already existing on Blue Mountain. The evidence in the record indicates that many of the answers to these questions could never be resolved definitively in advance of the project's being constructed and operated. If the answers to these questions turned out to be unfavorable to the Project, not only might the neighboring human and nonhuman communities be harmed, perhaps irreparably, but the County might face great political pressure to step in and correct the now altered situation. This assistance might include construction and extension of public water and sewer, at great public expense, to supply water to neighboring residences or to keep the Project viable. "We shall not undertake the controversy posed by the foregoing arguments because they demonstrate that the question [raised by the conflicting evidence] is 'fairly debatable'." *Fairfax County v. Southland Corp.*, 224 Va. 514, 524, 297 S.E.2d 718 (1982).

Whether the proposed conditional use in this case would be consistent with good zoning practices and would be consistent with the health, safety, and welfare of the county residents is a fairly debatable question based on the information that was available to the Board of Supervisors, and this Court may not substitute its judicial judgment for the legislative judgment exercised by the Board of Supervisors. The evidence presented to the Warren County Board of Supervisors and the consideration of the factors recited in the Board's resolution which denied the conditional use permit for this large project in an agricultural district were appropriate, and the evidence in the record rendered the issue of approval fairly debatable. The Board considered traffic conditions, septic and well concerns, environmental concerns, and the general character of the neighborhood in making their decision to deny the application for a conditional use permit for the project, and their decision was not arbitrary and capricious, nor was it the result of citizen pressure. Therefore, the action of the Warren County Board of Supervisors is affirmed, and the request of the Petitioners is denied.

### III. *Decision*

For the foregoing reasons, it is adjudged and ordered that the Board of Supervisors' decision denying the conditional use permit for the proposed Project in this case is affirmed, and the Petition is dismissed. This is a final order, and the Clerk is directed to place this among the ended causes.